**PACIFIC EASTERN CORPORATION and Harpeth Village Development Company, Plaintiffs/Appellants,**

v.

**GULF LIFE HOLDING COMPANY, Gulf Life Insurance Company, Gulf United Corporation, Gulf Mortgage and Realty Investments, GMR Properties, Grubb & Ellis, Manufacturers Hanover Corp., Manufacturers Hanover Trust Co., ITR Properties, Inc., Chemical Banking Corp., Chemical Bank, and American General Corporation, Defendants/Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 31, 1995.

Application for Permission to Appeal Denied by Supreme Court July 10, 1995.

Robert L. DeLaney, DeLaney & Cannon, James M. Cannon, Nashville, for appellant.

Thomas P. Kanaday, Jr., William L. Baggett, Jr., Farris, Warfield & Kanaday, Nashville, for American General Corp. and Gulf Life Ins. Co.

J. Mark Tipps, Bass, Berry & Sims, Nashville, for Grubb & Ellis Co., for appellee.

## OPINION

KOCH, Judge.

This appeal involves a 1971 lending transaction relating to the development of a Nashville hotel. The borrower filed suit in 1993 in the Chancery Court for Davidson County against nine defendants, including the original lender and its assignees, seeking to invalidate the transaction on the grounds of usury. The trial court dismissed the complaint against seven of the defendants on the ground that the statute of limitations for usury had expired. It also found that the complaint failed to state a claim against two of the seven defendants because the borrower's payments to these defendants were not interest. The borrower has appealed. We have determined that the proponents of the summary judgment have not demonstrated that they are entitled to a judgment as a matter of law, and therefore, we vacate the summary judgment.

### I.

Pacific Eastern Corporation is a Nashville-based company engaged in the hospitality

business. In 1971 it acquired a franchise from the Sheraton Corporation to build and operate a 150–room hotel in Nashville. Pacific Eastern also obtained an agreement from Gulf Mortgage & Realty Investments [1] to provide the financing for the construction of the hotel and for other related expenses.

At the August 4, 1971 closing, Gulf Mortgage & Realty Investments bought the 3.5 acre hotel site from Harpeth Village Development Company for $250,000.[2] Gulf Mortgage & Realty Investments then leased the property back to Pacific Eastern. The fifty-year ground lease permitted Pacific Eastern to purchase the property at market value after twenty-five years and required Pacific Eastern to make monthly payments equalling $1,980 plus two percent of the monthly revenues plus insurance and property taxes. Pacific Eastern also signed a non-negotiable deed of trust note for $1,400,000 with interest at 9½ percent payable in 245 equal monthly installments over twenty-two years as well as a deed of trust covering its leasehold interest in the hotel project.

The loan agreement included an "additional collateralization" clause entitling Gulf Mortgage & Realty Investment to require extra security if it felt insecure. Gulf Mortgage & Realty Investment invoked the clause in 1973 and required Pacific Eastern to purchase insurance on the life of its president from Gulf Life Insurance Company. Gulf Life Insurance Company received the premiums for this policy until it was acquired by American General Corporation in January 1984; thereafter, Pacific Eastern paid the premiums to American General.

Gulf Mortgage & Realty Investment changed its name to GMR Properties in 1977. On June 18, 1980, GMR Properties assigned Pacific Eastern's note, together with "a basketful" of other loans to Manufacturers Hanover Trust Company. The assignment was part of a bulk sale of loans at a discounted rate and was intended to satisfy GMR Properties' overdue indebtedness to Manufacturers Hanover. GMR Properties also sold the property on which the hotel was located to Manufacturers Hanover's real estate holding company.[3]

Following the 1988 recession, Pacific Eastern requested Manufacturers Hanover to refinance its loan to reduce its monthly payments. Manufacturers Hanover declined to renegotiate the loan but permitted Pacific Eastern to make interest-only payments from January 1991 to February 1992. It also declined Pacific Eastern's offer to purchase the property under the hotel.

Manufacturers Hanover merged with Chemical Bank Corporation in November 1991. Chemical Bank's threats of foreclosure forced Pacific Eastern to borrow additional funds in February 1992 to bring its principal payments current. Pacific Eastern then attempted to refinance its debt with other lenders but was unsuccessful because it did not own the property under the hotel. Pacific Eastern offered to buy the property from Chemical Bank for $98,500,[4] but Chemical Bank insisted that the property's market value was $650,000.

Pacific Eastern filed suit in January 1993 against five Gulf defendants,[5] Grubb & Ellis, American General, Manufacturers Hanover,

---

1. Gulf Mortgage & Realty Investments is a business trust created by Gulf Life Holding Company in 1970 to invest in real property. Gulf Life Holding Company also owns a subsidiary, Gulf Life Insurance Company, that is engaged primarily in the insurance business. Gulf Life Holding Company changed its name to Gulf United Corporation in 1980.

2. Harpeth Village Development Company is a Tennessee corporation whose sole shareholder is also Pacific Eastern's president and majority shareholder.

3. GMR Properties later merged with Grubb & Ellis in December 1980.

4. The quit claim deed from GMR Properties to Manufacturers Hanover recited that the actual value of the property was $98,500.

5. The five Gulf defendants include: Gulf Life Holding Company, Gulf United Corporation, Gulf Mortgage & Realty Investments, GMR Properties, and Gulf Life Insurance Company. Of these five, only Gulf Life Insurance Company remains in business.

and Chemical Bank alleging that the 1971 loan transaction was usurious. It alleged specifically that the sale and leaseback of the real property and the demand for insurance on the life of its president were subterfuges to collect interest in excess of the legal rate. It requested the court to invalidate the entire loan transaction or at least the sale and leaseback portion and also requested statutory damages for unconscionable conduct.

American General and Gulf Life Insurance Company filed a joint Tenn.R.Civ.P. 12.02(6) motion to dismiss on behalf of themselves and the other Gulf defendants, asserting that the suit was barred by the statute of limitations and that the insurance premium payments were not interest as a matter of law. The trial court granted the motion, and while Pacific Eastern's motion to alter or amend was pending, Grubb & Ellis filed its own motion to dismiss based on the statute of limitations.

On June 9, 1993, the trial court entered an order dismissing the complaint against the five Gulf defendants on the ground that Pacific Eastern's cause of action against these defendants accrued in June 1980 when GMR Properties assigned Pacific Eastern's note and deed of trust to Manufacturers Hanover. The trial court dismissed the complaint against Grubb & Ellis because it derived from the claim against GMR Properties and also dismissed the complaint against American General and Gulf Life Insurance Company on the ground that the insurance premium payments were not usury as a matter of law. The trial court certified this order as final in accordance with Tenn.R.Civ.P. 54.02.

## II.

### THE STANDARD OF REVIEW

 We must first identify the proper standard of review for this appeal. Pacific Eastern urges a broad "abuse of discretion" standard; while Grubb & Ellis, American General, and Gulf Life Insurance Company

advocate using the standard associated with Tenn.R.Civ.P. 12.02(6) motions requiring the reviewing court to assume the truth of all of the complaint's factual allegations and then to determine whether these allegations state a claim upon which relief can be granted. Neither standard is appropriate. Pacific Eastern's reliance on matters outside the pleadings converted the motion to dismiss to a motion for summary judgment.

### A.

Pacific Eastern filed its complaint on January 20, 1993. American General and Gulf Life Insurance Company filed their joint Tenn.R.Civ.P. 12.02(6) motion on March 11, 1993. On the same day, Pacific Eastern filed two affidavits supporting its request for a temporary injunction to prevent Chemical Bank from attempting to collect Pacific Eastern's loan. The trial court conducted a hearing on March 19, 1993 and entered an order on April 2, 1993, granting the temporary injunction.

Pacific Eastern and Harpeth Village Development Company [6] filed a memorandum in opposition to the motion to dismiss on April 19, 1993. The memorandum specifically requested the trial court to consider one of the affidavits Pacific Eastern had submitted to support its request for a temporary injunction. American General and Gulf Life Insurance Company objected to the consideration of the affidavit, but the record contains no indication that the trial court ever ruled on the objection. Later papers filed in the trial court indicate that the trial court did not exclude the affidavit from consideration, and in fact, the trial court's final order states that its decision to grant the motion to dismiss was based on "the entire record in this cause."

### B.

 American General and Gulf Life Insurance Company moved to dismiss the amended complaint for failure to state a

---

6. Pacific Eastern filed an amended complaint on March 18, 1993 that, among other things, added

Harpeth Village Development Company as a plaintiff.

claim upon which relief can be granted. Motions of this sort challenge the sufficiency of the complaint and do not require the consideration of matters beyond the pleadings. However, Tenn.R.Civ.P. 12.02 provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

The moving party generally triggers the conversion process by challenging the sufficiency of the pleader's complaint with materials not included in the pleadings; however, Tenn. R.Civ.P. 12.02 does not restrict the right to introduce extraneous materials to the moving party. The pleader may also bring about the conversion by submitting extraneous materials to oppose the motion to dismiss. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366, at 486–88 (2d ed. 1990) ("Federal Practice and Procedure").[7]

Trial courts have discretion to accept or exclude matters beyond the pleadings, Federal Practice and Procedure, *supra*, § 1366, at 491, and may prevent a conversion from taking place by declining to consider extraneous matters. 2A James W. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶ 12.09[3], at 12–107 (2d ed. 1994) ("Moore's Federal Practice"). They must, however, convert a Tenn.R.Civ.P. 12.02(6) motion to dismiss to a motion for summary judgment if they do not exclude the extraneous evidence. *Hixson v. Stickley*, 493 S.W.2d 471, 473 (Tenn.1973); *D.T. McCall & Sons v. Seagraves*, 796 S.W.2d 457, 459–60 (Tenn.Ct. App.1990).

### C.

Pacific Eastern made a tactical decision to oppose the motion to dismiss with two affidavits. The trial court did not exclude the affidavits from consideration and accordingly should have converted the motion to dismiss to a motion for summary judgment. Since the parties have not taken issue on appeal with the trial court's failure to convert the motion or with its consideration of the affidavit, they have waived their opportunity to take issue with these procedural errors.

Notwithstanding the trial court's oversight, we will review its decision to grant the motion to dismiss using the standard of review for Tenn.R.Civ.P. 56 motions. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 284 (3d Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Young v. Biggers*, 938 F.2d 565, 568 (5th Cir.1991); Moore's Federal Practice, *supra*, ¶ 12.09[3]. Accordingly, our task is to determine whether Tenn.R.Civ.P. 56's requirements have been met. *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn.1991); *Mansfield v. Colonial Freight Sys.*, 862 S.W.2d 527, 530 (Tenn.Ct.App. 1993).

Tenn.R.Civ.P. 56.03 contains two requirements for granting a summary judgment. First, there must be no genuine issue with regard to the material facts relevant to the claim or defense embodied in the motion. *Byrd v. Hall*, 847 S.W.2d at 211. Second, the moving party must be entitled to a judgment as a matter of law based on the undisputed facts. *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn.1993).

### III.

#### THE APPLICABLE STATUTE OF LIMITATIONS

The next issue to be decided concerns which statute of limitations applies to this case. Tenn.Code Ann. § 28–3–107 (1980) prescribes a two-year statute for usury actions, while Tenn.Code Ann. § 47–14–118(a) (1988) prescribes a three-year statute. We

---

7. Decisions of federal courts construing analogous federal procedural rules can provide helpful guidance in interpreting our own procedural rules. *Byrd v. Hall*, 847 S.W.2d 208, 211 n. 2 (Tenn.1993); *Continental Casualty Co. v. Smith*, 720 S.W.2d 48, 49 (Tenn.1986).

have determined that the three-year statute in Tenn.Code Ann. § 47–14–118(a) controls.

## A.

### DOUBLE CODIFICATION OF A SINGLE ACT

The fact that the Tennessee Code Annotated contains two statutes of limitations for usury is the result of a codification anomaly that occurred over ninety years ago. In 1903, the General Assembly enacted a two-year statute of limitations for usury. Act of April 13, 1903, ch. 439, § 1, 1903 Tenn.Pub. Acts 1243.[8] For reasons obscured by the passage of time, Robert T. Shannon included the act twice in the 1904 supplement to his 1896 code. *See* Supplement to Shannon's Code §§ 3504, 4469 (1904).

All subsequent codes have perpetuated Mr. Shannon's decision to include the same act in two separate places. Mr. Shannon himself repeated the duplication in his 1917 code, although he renumbered the sections and deleted language found unnecessary by the Tennessee Supreme Court. *See* Shannon's Code §§ 3504a1, 4469a2 (1917).[9] The 1932 Code of Tennessee perpetuated Mr. Shannon's decision by including the act in both Section 7316 and Section 8597.

The Tennessee Code Commission continued to duplicate the provisions in the 1955 code, although they too renumbered the sections. Section 7316 of the 1932 Code became Tenn.Code Ann. § 47–1618 (1955), and Section 8597 became Tenn.Code Ann. § 28–307 (1955). Both sections have remained in the Tennessee Code Annotated ever since, although they were again renumbered when the codifiers changed the code's numbering from a two-tiered to a three-tiered system.[10]

Thus, as matters stood in 1977, the Tennessee Code Annotated contained two identical versions of the 1903 act. One appeared in Tenn.Code Ann. § 28–307; the other in Tenn.Code Ann. § 47–14–118.

Prior to 1978, the Constitution of Tennessee capped interest rates at ten percent. The constitutional interest rate ceiling restricted the availability of credit during periods of inflation, and so in March 1976, the General Assembly called a limited constitutional convention to address several issues, including interest rates.[11] On December 1, 1977, the convention adopted an amended version of Tenn. Const. art. XI, § 7 stating:

> The General Assembly shall define and regulate interest, and set maximum effective rates thereof.

> If no applicable statute is hereafter enacted, the effective rate of interest collected shall not exceed ten percent (10%) per annum.

> All provisions of existing statutes regulating rates of interest and other charges on loans shall remain in full force and effect until July 1, 1980, unless earlier amended or repealed.

The public approved the amended section on March 7, 1978, and the governor proclaimed it adopted on March 31, 1978.

The Ninety–First General Assembly convened in 1979 faced with the prospect of the imminent expiration of all existing statutes governing interest rates. Accordingly, it enacted several pieces of legislation completely reforming the statutes on interest and usu-

---

8. Section 1 of the act provided "[t]hat no action shall be brought on any claim for usury after two years from the date of the payment of the debt upon which such claim for usury shall be based; Provided, That this Act shall not affect any litigation now pending."

9. Mr. Shannon deleted the phrase "Provided, That this Act shall not affect any litigation now pending" because the Tennessee Supreme Court had determined that it had no effect. *Slover v. Union Bank*, 115 Tenn. 347, 351, 89 S.W. 399, 399 (1905).

10. Tenn.Code Ann. § 1–1–108(a) (1985) authorizes the Tennessee Code Commission "to rearrange, regroup and renumber the titles, chapters, sections and parts of sections of the statutes, codes and code supplements...." The commission adopted a three-tiered numbering system for Title 47 in 1964 and for Title 28 in 1980.

11. Act of Mar. 19, 1976, ch. 848, 1976 Tenn.Pub. Acts 1287. A discussion of the interest rate issue can be found in Lewis L. Laska, *The 1977 Limited Constitutional Convention*, 61 Tenn.L.Rev. 485, 488–89, 507–15 (1994).

ry.[12] One act contained a new three-year statute of limitations for usury that stated:

> No action shall be brought on any claim for usury after three (3) years from the date of last payment of the same or foreclosure or court action, whichever ensues first.

> No action shall be brought on any claim for excessive loan charges, commitment fees, or brokerage commissions after three years from the date of payment of the same.

Act of April 24, 1979, ch. 203, § 17, 1979 Tenn.Pub.Acts 349, 359 (codified at Tenn. Code Ann. § 47–14–118). That same act also repealed the two-year statute of limitations for usury in Tenn.Code Ann. § 47–14–118 and "all other laws or parts of laws inconsistent herewith." Act of April 24, 1979, ch. 203, § 24, 1979 Tenn.Pub.Acts 349, 361. The effective date section provided, in part, that "[t]ransactions entered into before the effective date of this Act may be completed in accordance with prior law." Act of April 24, 1979, ch. 203, § 27, 1979 Tenn.Pub.Acts 349, 362.

Section 24 of Chapter 203 did not specifically repeal Tenn.Code Ann. § 28–307. The legislative history provides no direct insight into whether the failure to specifically repeal Tenn.Code Ann. § 28–307 was intentional or inadvertent. The Tennessee Code Commission renumbered Tenn.Code Ann. § 28–307 as Tenn.Code Ann. § 28–3–107 in 1980. Thus, for the past fifteen years, Tenn.Code Ann. § 28–3–107 has contained the two-year statute of limitations for usury first enacted in 1903, and Tenn.Code Ann. § 47–14–118 has contained the three-year statute of limitations enacted in 1979.

**B.**

## THE REPEAL BY IMPLICATION OF THE TWO-YEAR STATUTE OF LIMITATIONS

 Courts must construe statutes as they find them, *Watts v. Putnam County,* 525 S.W.2d 488, 494 (Tenn.1975), and must give statutes their fullest possible effect without unduly restricting or expanding them beyond their intended scope. *Wilson v. Johnson County,* 879 S.W.2d 807, 809 (Tenn. 1994); *Davenport v. Chrysler Credit Corp.,* 818 S.W.2d 23, 27 (Tenn.Ct.App.1991). When possible, the courts must also avoid constructions that place one statute in conflict with another. *State ex rel. Metropolitan Gov't v. Spicewood Creek Watershed Dist.,* 848 S.W.2d 60, 62 (Tenn.1993); *Laymance v. Vaughn,* 857 S.W.2d 36, 37 (Tenn.Ct.App. 1992).

It is difficult not to perceive the conflict between Tenn.Code Ann. § 28–3–107 and Tenn.Code Ann. § 47–14–118(a). Both statutes relate precisely to the same cause of action, but they prescribe different limitation periods. We cannot construe these statutes harmoniously without contorting their plain language and stretching the reader's credulity. When a conflict like this one presents itself, however, we must still search for and give the fullest possible effect to the legislative purpose underlying both statutes. *Tennessee Eastman Corp. v. Newman,* 22 Tenn. App. 270, 278–79, 121 S.W.2d 130, 135 (1938).

 Even though the doctrine of repeal by implication is not favored, *Freels v. Northrup,* 678 S.W.2d 55, 58 (Tenn.1984), the courts may use it to resolve inescapable statutory conflicts. *State v. Moore,* 722 S.W.2d 367, 374 (Tenn.1986); *Harman v. Moore's Quality Snack Foods, Inc.,* 815 S.W.2d 519,

---

12. See Act of April 24, 1979, ch. 203, 1979 Tenn.Pub.Acts 349 (revising general laws relating to interest); Act of April 25, 1979, ch. 204, 1979 Tenn.Pub.Acts 363 (revising the statutes relating to interest charged by Industrial Loan and Thrift Companies); Act of April 25, 1979, ch. 205, 1979 Tenn.Pub.Acts 391 (revising the laws relating to interest on installment loans); Act of April 25, 1979, ch. 206, 1979 Tenn.Pub.Acts 395 (revising the laws relating to interest on home improvement installment loans); Act of April 25, 1979, ch. 207, 1979 Tenn.Pub.Acts 398 (revising the statutes relating to interest rates on loans by credit unions); Act of April 25, 1979, ch. 208, 1979 Tenn.Pub.Acts 402 (revising the statutes relating to interest rates on home loans); Act of April 25, 1979, ch. 209, 1979 Tenn.Pub.Acts 405 (relating to the power of banks to make loans).

523 (Tenn.Ct.App.1991). The doctrine provides that the later of two conflicting statutes prevails, while the earlier is repealed by implication. *Steinhouse v. Neal,* 723 S.W.2d 625, 627 (Tenn.1987); *State v. Moore,* 722 S.W.2d at 374; *English v. Farrar,* 206 Tenn. 188, 200, 332 S.W.2d 215, 220 (1960). Accordingly, when the General Assembly enacted a new statute covering the entire subject matter of an earlier statute, the courts will conclude that one of the purposes of the new statute was to repeal the earlier one. *State ex rel. Ward v. Murrell,* 169 Tenn. 688, 691, 90 S.W.2d 945, 946 (1936); *Melton v. State,* 160 Tenn. 273, 276, 23 S.W.2d 662, 663 (1930).

■ The legislative history of Chapter 203 and the other 1979 acts demonstrates that their purpose was to replace all the existing statutes governing interest and usury. Section 24 of Chapter 203 specifically repealed the two-year statute of limitations for usury in Tenn.Code Ann. § 47–14–118 and would have also repealed Tenn.Code Ann. § 28–307 had it not been for a drafting oversight. Accordingly, we find that the purpose of Sections 17 and 24 of Chapter 203 was to replace the two-year statute of limitations for usury with a three-year statute and, therefore, that the General Assembly repealed Tenn.Code Ann. § 28–307 by implication when it enacted Chapter 203.

■ The General Assembly recodified the two-year statute of limitations for usury when it changed Title 28 from a two-tiered to a three-tiered numbering system in 1980.[13] This action did not revive the two-year statute of limitations because repealed legislation is not revived by subsequent inclusion in an adopted code. *Ex parte Olden,* 88 Okla. Crim. 56, 199 P.2d 228, 237–38 (Okla.Crim. App.1948); 1A Norman J. Singer, *Statutes & Statutory Construction* § 28.08, at 485 (5th ed. 1993). The General Assembly impliedly repealed Tenn.Code Ann. § 28–307 in 1979 when it enacted new, comprehensive statutes governing interest and usury. The purpose of the 1980 codification bill was not to enact substantive law but rather to adopt and approve the work of the Tennessee Code Commission. Accordingly, the two year statute of limitations for usury was effectively repealed when Chapter 203 became effective.

## C.

### THE STATUTE OF LIMITATIONS GOVERNING THIS CLAIM

■ Holding that Chapter 203 repealed Tenn.Code Ann. § 28–3–107 by implication does not end the matter. We must still decide whether the three-year statute of limitations in Tenn.Code Ann. § 47–14–118(a) applies to loans made or causes of action for usury accruing prior to May 1, 1979. We hold that Tenn.Code Ann. § 47–14–118(a) applies to all causes of action for usury that had not expired under the two-year statute of limitations prior to midnight on April 30, 1979.

■ The courts favor statutes of limitations. *Applewhite v. Memphis State Univ.,* 495 S.W.2d 190, 195 (Tenn.1973); *Shelby's Heirs v. Shelby,* 3 Tenn. (1 Cooke) 179, 184–85 (1812). Their purpose is to ensure fairness by preventing undue delay in bringing suit after a cause of action has accrued. *Quality Auto Parts Co. v. Bluff City Buick Co.,* 876 S.W.2d 818, 820 (Tenn.1994); *Hackworth v. Ralston Purina Co.,* 214 Tenn. 506, 509, 381 S.W.2d 292, 294 (1964). Unless the limitations period has expired, a statute of limitations involves remedies, not substantive rights. *Watts v. Putnam County,* 525 S.W.2d at 492; *Hackworth v. Ralston Purina Co.,* 214 Tenn. at 510, 381 S.W.2d at 294.

■ The General Assembly has complete control, within constitutional limits, over the remedies available to persons seeking judicial relief. *Alamo Dev. Corp. v. Thomas,* 186 Tenn. 631, 640, 212 S.W.2d 606, 610 (1948); *Cavender v. Hewitt,* 145 Tenn. 471, 479–80, 239 S.W. 767, 770 (1922). It may decide that an amended statute of limitations should apply to existing causes of action as long as doing so does not impair a

---

**13.** Act of Jan. 31, 1980, ch. 444, 1980 Tenn.Pub. Acts 1.

vested right or contractual obligation in violation of Tenn. Const. art. I, § 20. *Jones v. Coal Creek Mining & Mfg. Co.,* 133 Tenn. 159, 173–74, 180 S.W. 179, 183 (1915); *Slover v. Union Bank,* 115 Tenn. at 350, 89 S.W. at 399 (1905).

■■■ To be consistent with Tenn. Const. art. I, § 20, an amended statute of limitations cannot revive causes of action that have already expired prior to the effective date of the amendment. *Ford Motor Co. v. Moulton,* 511 S.W.2d 690, 695 (Tenn.), *cert. denied,* 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 109 (1974); *Yancy v. Yancy,* 52 Tenn. (5 Heisk.) 353, 363–64 (1871). By the same token, an amendment that shortens an existing statute of limitations cannot extinguish a cause of action that has already accrued without giving the plaintiff a reasonable opportunity to bring suit after the effective date of the amendment. *Alamo Dev. Corp. v. Thomas,* 186 Tenn. at 636, 212 S.W.2d at 608; *Jones v. Coal Creek Mining & Mfg. Co.,* 133 Tenn. at 173–74, 180 S.W. at 183; *Slover v. Union Bank,* 115 Tenn. at 350, 89 S.W. at 399.

■■■ Courts generally construe statutes to operate prospectively in the absence of clear legislative intent to the contrary. *Woods v. TRW, Inc.,* 557 S.W.2d 274, 275 (Tenn.1977); *American Network Group, Inc. v. Kostyk,* 804 S.W.2d 447, 450 (Tenn.Ct.App. 1990). Remedial or procedural statutes are recognized as exceptions to this rule. These statutes apply to causes of action arising before their effective date unless the legislature indicates a contrary purpose or unless such an application would produce an unjust result. *Kee v. Shelter Ins.,* 852 S.W.2d 226, 228 (Tenn.1993); *Saylors v. Riggsbee,* 544 S.W.2d 609, 610 (Tenn.1976).

Accordingly, we must decide whether applying Tenn.Code Ann. § 47–14–118(a) to

causes of action for usury that accrued prior to May 1, 1979 would violate Tenn. Const. art. I, § 20. If the application would not disturb a vested right or contractual obligation, we must then decide whether the General Assembly intended for the three-year statute of limitations to operate prospectively only and whether applying it to existing causes of action would produce unjust results.

The defendants in this case have no vested right or contractual interest in the three-year statute of limitations in Tenn.Code Ann. § 47–14–118(a). They likewise have no vested right or contractual interest in the two-year statute of limitations unless Pacific Eastern's cause of action for usury had expired under the two-year statute before May 1, 1979 or unless they had specifically contracted for a two-year statute of limitations.[14] By the same token, Pacific Eastern has no vested right or contractual interest in the three-year statute of limitations in Tenn. Code Ann. § 47–14–118(a).

Many of the earlier decisions concerning the application of amendments to statutes of limitations have involved amendments that shortened the limitations period.[15] This case involves a different circumstance because the 1979 amendment to the statute of limitations for usury extended, rather than shortened, the statute of limitations. In similar circumstances, other jurisdictions have upheld applying an extension to a limitations period that was already running but had not yet expired when the extension became effective. *Garris v. Weller Constr. Co.,* 132 So.2d 553, 555–56 (Fla.1960); *Kemper v. Warren Petroleum Corp.,* 451 N.E.2d 1115, 1117 (Ind.Ct. App.1983); *New Hampshire v. Martin,* 138 N.H. 508, 643 A.2d 946, 948 (1994); *Trinity Broadcasting Corp. v. Leeco Oil Co.,* 692 P.2d 1364, 1366–67 (Okla.1984). We find this reasoning persuasive.

**14.** The retroactive application of an amendment extending a contractual limitations period would violate Tenn. Const. art. I, § 20 because the agreed upon limitations period is a contractual obligation. *Kee v. Shelter Ins.,* 852 S.W.2d at 228; *Algee v. State Farm Gen. Ins. Co.,* 890 S.W.2d 445, 448 (Tenn.Ct.App.1994).

**15.** *See, e.g., Redmon v. LeFevre,* 503 S.W.2d 97, 98 (Tenn.1973) (shortening the statute of limita-

tions for legal malpractice from six to one year); *Alamo Dev. Corp. v. Thomas,* 186 Tenn. at 633–34, 212 S.W.2d at 607 (shortening the nonclaim statute from twelve to nine months); *Slover v. Union Bank,* 115 Tenn. at 349, 89 S.W. at 399 (shortening the statute of limitations for usury from six to two years).

Chapter 203 does not state specifically that the three-year statute of limitations in Tenn. Code Ann. § 47–14–118(a) should not apply to causes of action existing on May 1, 1979. Section 27 of Chapter 203 provides that "[t]ransactions entered into before the effective date of this Act may be completed in accordance with prior law," but this language applies only to the substantive terms of the loans made prior to May 1, 1979.

The legislation itself, as well as its legislative history, demonstrates that Chapter 203 had three purposes. First, it was intended to rewrite all the state laws dealing with interest in response to the 1978 amendment to Tenn. Const. art. XI, § 7. Second, it was intended to leave existing loan transactions undisturbed. Third, it was intended to provide persons required to pay usury with a longer statute of limitations.[16] Accordingly, we find that the purpose of Chapter 203, § 27 was not to prevent applying Tenn.Code Ann. § 47–14–118(a) to usury causes of action accruing prior to May 1, 1979, but rather to preserve the substantive terms of the loans made prior to that time.

Applying Tenn.Code Ann. § 47–14–118(a) to causes of action existing on its effective date will not produce unjust results. It will not cut off the claims of usury victims, nor will it impair the vested rights or contractual expectations of lenders. Accordingly, we hold that the three-year statute of limitations in Tenn.Code Ann. § 47–14–118(a) applies to causes of action for usury existing on May 1, 1979 and to causes of action for usury accruing after May 1, 1979 based on lending transactions entered into prior to May 1, 1979.[17]

**D.**

**PACIFIC EASTERN'S CLAIM DID NOT ACCRUE BEFORE MAY 1, 1979**

As a final matter, we must decide whether Pacific Eastern's cause of action for usury

accrued and expired before May 1, 1979—the effective date of the three-year statute of limitations. If it did, then the enactment of Tenn.Code Ann. § 47–14–118(a) could not revive it. If it did not, then Tenn.Code Ann. § 47–14–118(a) governs the timeliness of Pacific Eastern's complaint. This decision must rest upon the two-year statute of limitations existing before May 1, 1979.

Prior to May 1, 1979, no action for usury could be brought "after two years from the date of the payment of the debt upon which such claim for usury shall be based." See Tenn.Code Ann. § 47–14–118 (repealed 1979); Tenn.Code Ann. § 28–3–107. Usury is the taking of more interest for the use of money than the law allows. *Parham v. Pulliam*, 45 Tenn. (5 Cold.) 497, 501 (1868). Accordingly, an equitable cause of action for usury does not accrue until the lender has received usury. *Bobo v. People's Nat'l Bank*, 92 Tenn. 444, 449, 21 S.W. 888, 889–90 (1893), *overruled on other grounds*, *Meredith v. American Nat'l Bank*, 127 Tenn. 90, 92, 153 S.W. 479, 480 (1913); *Russellville Bank & Trust Co. v. McGhee*, 16 Tenn.App. 460, 480, 65 S.W.2d 202, 212 (1932). A lender has not received usury until the borrower's aggregated payments exceed the principle and the maximum amount of interest that could have been legally charged. *Bobo v. People's Nat'l Bank*, 92 Tenn. at 448–49, 21 S.W. at 889; *Threadgill v. Timberlake*, 39 Tenn. (2 Head) 395, 397 (1859); *Boyers v. Boddie*, 22 Tenn. (3 Hum.) 666, 669 (1842); *Hayes v. Bank of Lewisburg*, 39 S.W. 753, 756 (Tenn.Ch.App.1897).

The Gulf defendants have not asserted that Pacific Eastern's cause of action for usury accrued or expired prior to May 1, 1979. There is, in fact, substantial doubt that Pacific Eastern had paid usury by that time. The

16. Chapter 203, § 17, as originally introduced, contained a two-year statute of limitations. The Senate amended Section 17 on April 17, 1979 to provide for a three-year statute of limitations. *See* Amendment 10, 1979 Senate Journal 940. The House of Representatives concurred in the Senate amendment on April 24, 1979. *See* Senate Amendment 10, 1979 House Journal 1128. During the House debate on the Senate amend-

ment, the bill's chief house sponsor explained to his colleagues that the purpose of the amendment was to lengthen the statute of limitations.

17. Of course, determinations concerning whether a pre-May 1, 1979 lending transaction is usurious or whether a cause of action expired prior to May 1, 1979 must be made in light of the law as it existed prior to May 1, 1979.

event that allegedly triggered the running of the statute of limitations occurred after May 1, 1979. Accordingly, we find that Pacific Eastern's cause of action for usury did not expire prior to May 1, 1979 and, therefore, that Tenn.Code Ann. § 47–14–118(a) controls the outcome of the Gulf defendants' summary judgment motion.

## IV.

**THE TIMELINESS OF PACIFIC EASTERN'S CLAIM**

Since Tenn.Code Ann. § 47–14–118(a) became effective, no action for usury can be brought "after three years from the date of the last payment of the same or foreclosure or court action, whichever ensues first." Like its predecessors, Tenn.Code Ann. § 47–14–118(a) does not prevent filing suit as soon as usury is paid; it simply provides that usury claims cannot be filed after three years from the last payment of the debt, court action, or foreclosure. *See Russellville Bank & Trust Co. v. McGhee*, 16 Tenn.App. at 478, 65 S.W.2d at 211.

■ Tenn.Code Ann. § 47–14–118(a)'s legislative history elucidates the meaning of the phrase "last payment." The Senate sponsor of the amendment that added this language to the bill on April 17, 1979 explained:

> If it's usury, that is, if you're charged too much interest, you do it from the last payment, from any foreclosure on it or from the court action on it, the first of those that would happen. That means that if you've got a 30–year note, when you get to the last payment on that note, you've still got three years to bring your suit for usury.

Similarly, the bill's House sponsor explained the amendment to his colleagues on April 24, 1979 as follows:

> Now, if a loan is usurious, then the first payment would be usury. The Senate changed that to make it the last payment of a usury loan, which I think is an excellent amendment.

\* \* \* \* \* \*

It [the Senate amendment] only lengthens the statute of limitations by which you can defend. If you make a three-year installment loan, the first payment you make, if the entire loan was usurious, would be usury, and under the way it was originally passed, it would only give them three years from the first date of payment. This [the Senate amendment] would give them three years from the last date of payment.

Accordingly, the term "last payment" in Tenn.Code Ann. § 47–14–118(a) means the final payment of the loan.

■ The date that a note has been "paid" or "finally paid" for the purpose of the statute of limitations for usury has received extensive judicial consideration. In order to begin the running of the statute of limitations, the payment must be the one that brings the dealings between the parties to a close. Paying off a note, accordingly, is not a final payment if the note is one of a series of notes that is part of a continuing transaction between the parties. *Slover v. Union Bank*, 115 Tenn. at 349, 89 S.W. at 399; *Boyers v. Boddie*, 22 Tenn. (3 Hum.) at 669. Paying off a note is a final payment for the purpose of the statute of limitations, however, if it is a novation or final settlement of the transaction. *Peoples Bank of Clifton v. Russ*, Wayne Equity, slip op. at 6 (Tenn. June 6, 1932); *Crabb v. Cole*, 19 Tenn.App. 201, 206–07, 84 S.W.2d 597, 600 (1935); *Lauderdale v. Rogers*, 6 Tenn.App. 26, 30–31 (1927).

■ A novation is the substitution of a new contract for an existing one. *Sharp v. Fly*, 68 Tenn. 4, 10 (1876); *Blaylock v. Stephens*, 36 Tenn.App. 464, 467, 258 S.W.2d 779, 781 (1953); Restatement (Second) of Contracts § 280 (1979); 15 Samuel Williston, *A Treatise on the Law of Contracts* § 1865, at 585, 587 (Walter H.E. Jaeger ed., 3d ed. 1972). It differs from an assignment because it requires the assent of all the parties while an assignment requires neither the knowledge nor the assent of the obligor and because an assignment cannot change the obligor's performance. 3 Samuel Williston, *A Treatise on the Law of Contracts* § 433 (Wal-

ter H.E. Jaeger ed., 3d ed. 1960); Restatement (Second) of Contracts §§ 280 cmt. e, 323 cmt. a (1979).

A novation extinguishes the existing contract. *Blaylock v. Stephens*, 36 Tenn.App. at 467, 258 S.W.2d at 781. An assignment, on the other hand, does not extinguish the existing contract but rather transfers the assignor's rights against the obligor to the assignee. *Commerce Union Bank v. Blalock*, 38 Tenn.App. 260, 267, 273 S.W.2d 487, 491 (1954). Thus, the assignee succeeds to the assignor's rights under the original agreement. *Aetna Casualty & Sur. Co. v. Tennessee Farmers Mut. Ins. Co.*, 867 S.W.2d 321, 323 (Tenn.Ct.App.1993); *Brummitt Tire Co. v. Sinclair Ref. Co.*, 18 Tenn. App. 270, 281, 75 S.W.2d 1022, 1028 (1934). The assignee's rights under the original contract are subject to all the defenses available against the assignor at the time of the assignment. *Binswanger Southern (N.C.), Inc. v. Textron, Inc.*, 860 S.W.2d 862, 865 (Tenn. Ct.App.1993); *Third Nat'l Bank v. Capitol Records, Inc.*, 60 Tenn.App. 189, 197, 445 S.W.2d 471, 474 (1969).

The motion for summary judgment asserts that Pacific Eastern's usury cause of action accrued on June 18, 1980 when GMR Properties assigned Pacific Eastern's note and deed of trust to Manufacturers Hanover. In order to be entitled to a judgment as a matter of law, the moving parties must demonstrate that Pacific Eastern had started paying usury on or before June 18, 1980 and that the assignment amounted to a final settlement or novation of the usurious transaction. The moving parties fail on both counts.

The record does not establish beyond factual dispute that the aggregate payments Pacific Eastern made from August 4, 1971 through June 18, 1980 exceeded the total amount of principal and the maximum amount of interest the lender would have been entitled to charge. If, as Pacific Eastern contends, the principal amount of the loan was $1,650,000 at 9½% for 245 equal monthly installments, the total amount of

principal and legal interest payments would have been approximately $3,700,000. According to the schedule of payments attached to Alton B. Turnipseed's affidavit, Pacific Eastern's total payments through the end of 1980 were less than $3,700,000.

Likewise, the undisputed facts do not support the conclusion that the assignment of Pacific Eastern's note to Manufacturers Hanover was a novation. A simple novation involving the substitution of an obligee results when an obligee promises its obligor to discharge the obligor's duty in consideration for the obligor's promise to a third person to render the performance due or some other performance. Restatement (Second) of Contracts § 280 cmt. e (1979). It requires the agreement of all the parties to the old contract and to the new contract. *Columbia Grocery Co. v. Marshall*, 131 Tenn. 270, 275, 174 S.W. 1108, 1110 (1915).

The moving parties have not demonstrated any specific agreements between Pacific Eastern and either GMR Properties or Manufacturers Hanover. The June 18, 1980 transaction involved only an assignment of Pacific Eastern's note and deed of trust from GMR Properties to Manufacturers Hanover. It did not create a new indebtedness, but rather changed the obligee of an existing one. Since the June 18, 1980 transaction did not extinguish Pacific Eastern's existing indebtedness, it did not trigger the running of the statute of limitations. Accordingly, the moving parties have not demonstrated that they are entitled to a judgment as a matter of law based on the running of the three-year statute of limitations in Tenn.Code Ann. § 47–14–118(a).

## V.

### THE CHARACTERIZATION OF THE INSURANCE PREMIUMS

The final issue on this appeal concerns the characterization of the premiums for the insurance policy on the life of Pacific Eastern's president. Pacific Eastern bought the policy after Gulf Mortgage & Realty Investments

invoked the additional collateralization clause and paid the premiums to Gulf Life Insurance Company from 1973 until 1984 and then to American General. Pacific Eastern and Harpeth Village Development Company assert that these premiums are actually disguised usurious interest.

■ Tenn.Code Ann. § 47–14–102(7) (1988) defines "interest" as "compensation for the use or detention of, or forbearance to collect, money over a period of time, and does not include compensation for other purposes, including, but not limited to, time-price differentials, loan charges, brokerage commissions, or commitment fees." Interest does not include bona fide expenses incident to making the loan and furnishing the lender with satisfactory security for the loan's repayment. *Silver Homes, Inc. v. Marx & Bensdorf, Inc.*, 206 Tenn. 361, 364–65, 333 S.W.2d 810, 812 (1960); *Koen v. State*, 162 Tenn. 573, 581, 39 S.W.2d 283, 285 (1931).

■ Determinations concerning whether a transaction is usurious are based on what the lender receives, not what the borrower pays. *Rush v. Chattanooga Du Pont Employees' Credit Union*, 210 Tenn. 344, 348, 358 S.W.2d 333, 335 (1962); *Silver Homes, Inc. v. Marx & Bensdorf, Inc.*, 206 Tenn. at 364, 333 S.W.2d at 811–12. The courts look to the substance, not the form, of the transaction under scrutiny and will treat a transaction as a a loan if that is, in fact, what it is. *Mallory v. Columbia Mortgage & Trust Co.*, 150 Tenn. 219, 224, 263 S.W. 68, 70 (1924); *Halco Fin. Servs., Inc. v. Foster*, 770 S.W.2d 554, 555 (Tenn.Ct.App.1989); *Adams v. Schwartz*, 49 Tenn.App. 523, 531, 356 S.W.2d 597, 600 (1960).

■ Gulf Life Insurance and American General rely on the Tennessee Supreme Court's decision in *Silver Homes, Inc. v. Marx & Bensdorf, Inc.* to support their claim that the insurance premiums in this case were bona fide expenses relating to the provision of additional security for the loan. The Court held in that case that the mortgage insurance premiums were not interest

because they were for the borrower's benefit and because they were not retained by the lender. *Silver Homes, Inc. v. Marx & Bensdorf, Inc.*, 206 Tenn. at 368–69, 333 S.W.2d at 813. We cannot conclude at this stage of the proceeding that the insurance premiums in this case were not actually interest.

Pacific Eastern argued that *Silver Homes, Inc. v. Marx & Bensdorf, Inc.* is inapplicable to this case because Gulf Life Insurance was actually one of the lenders in this transaction. It supported this claim with an affidavit stating that "Gulf Life Insurance participated in the loans that were placed with Gulf Mortgage and Realty Investment Trust to the extent of 10% to 25%." The Gulf defendants vigorously challenged the affidavit's admissibility and denied that Gulf Life Insurance had an interest in the lending transaction.

Gulf Life Insurance and American General are entitled to a summary judgment on the insurance premium issue only if the record contains no genuine dispute concerning the material facts and if they demonstrate that they are entitled to a judgment as a matter of law. Tenn.R.Civ.P. 56.03. When determining whether a genuine factual dispute exists, the courts must take the strongest legitimate view of the evidence that favors the nonmoving party, *Eyman v. Kentucky Cent. Ins. Co.*, 870 S.W.2d 530, 531 (Tenn.Ct. App.1993), must discard all countervailing evidence, and must allow all reasonable inferences in the nonmoving party's favor. *Byrd v. Hall*, 847 S.W.2d at 210–11.

The affidavit submitted by Pacific Eastern creates a genuine factual dispute concerning whether Gulf Life Insurance Company was a lender. This dispute prevents a summary disposition of the claim that the insurance premiums were, in effect, payments of additional interest received and retained by one of the lenders. It also prevents the summary disposition of the claim against American General since that claim is derivative of the claim against Gulf Life Insurance Company. Accordingly, the trial court erred by dismissing Pacific Eastern and Harpeth Vil-

lage Development Company's claim that the life insurance premiums should be considered to be interest for the purposes of their usury claim.

## VI.

We vacate the order dismissing Pacific Eastern and Harpeth Village Development Company's usury claims against the Gulf defendants, American General, and Grubb & Ellis and remand the case to the trial court for further proceedings. We tax the costs of the appeal jointly and severally to Gulf Life Holding Company, Gulf United Corporation, Gulf Mortgage & Realty Investments, GMR Properties, Grubb & Ellis, and American General Corporation for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.