# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 5, 2013 Session

## JACK E. MILLER v. BOYD WYATT

**Appeal from the Circuit Court for Cumberland County**
**No. CV005372      Amy V. Hollars, Judge**

---

**No. E2013-00491-COA-R3-CV-FILED-FEBRUARY 26, 2014**

---

Jack E. Miller, a former City Manager of Crossville, filed this defamation action against Councilman Boyd Wyatt, based on Wyatt's statement during a City Council meeting that Miller had been "discharged from City Manager up here because of misappropriating funds and not following procedures." Wyatt moved for summary judgment, arguing, among other things, that he was protected by legislative privilege under the common law and Tenn. Code Ann. § 29-20-201(b)(2) (2012), which statute provides that "[a]ll members of boards, commissions, agencies, authorities, and other governing bodies of any governmental entity . . . shall be immune from suit arising from the conduct of the affairs of such board, commission, agency, authority, or other governing body." The trial court granted summary judgment on the ground that Wyatt had immunity under § 29-20-201(b) because the alleged defamatory statement arose "from the conduct of the affairs of" the Crossville City Council. We agree with the trial court that Wyatt's statement was made in the course of conducting the affairs of the City Council and, therefore, was protected by legislative privilege. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Mark N. Foster, Rockwood, Tennessee, for the appellant, Jack E. Miller.

Lane Moore, Cookeville, Tennessee, for the appellee, Boyd Wyatt.

# OPINION

## I.

A bit of Crossville's recent political history provides the backdrop for this case. In the fall of 2010, Mayor J.H. Graham, III, was running for re-election. Also running for Mayor was City Councilman Jesse Kerley. Wyatt, a Graham supporter, placed an item on the agenda of the City Council meeting of October 12, 2010,[1] captioned "Item #8: Matters Relative to Political Ads." Councilman Wyatt asserted that the purpose of Item #8 was to discuss and refute certain allegations regarding city employees, including Mayor Graham, in political advertisements run by Kerley. When Item #8 came up for discussion at the meeting, Councilman Earl Dean moved for its removal from the agenda stating that it was improper because "I don't believe that the politics should be upon this Council." In response to Dean's motion, Wyatt stated:

> This ad, these ads and this Agenda item was [sic] put on here by me. And it's not meant to be a political forum of any kind. It wasn't meant to be a political debate for any – the Mayor's race, or Councilman race, or anything of that nature. Now, I feel very strongly. And you will hear from me in regard to this about these ads and what they said in regards to the City employees and the Council – of which Mr. Dean was part of. Now these ads, in my opinion, are not just against Councilman Wyatt, Mayor Graham, Councilman Duer. They are also about all of this Council, Mr. Kerley.

The motion to remove was defeated by a 3-2 vote, with Dean and Kerley voting to remove Item #8, and Graham, Wyatt, and Councilman Carl Duer voting to retain it on the agenda. Dean then left the meeting, apparently in protest.

After Dean's exit, Wyatt stated the following:

> First of all, ladies and gentlemen, the Agenda item was put on tonight's meeting by me . . . for the sole purpose of answering a political ad by Jesse Kerley that ran in the Chronicle on October the 1st and another date that questions the

---

[1]This meeting was videotaped and a copy of the recording was provided to the trial court and is included in the appellate record. Consequently, there is no genuine issue of material fact regarding what transpired at the meeting.

professionalism, honesty, integrity and accuracy of the City employees and Council in regards to recording documentation of Council Minutes.

This ad would lead you to believe that there are employees that have not done their job properly, and that the City Manager and Council have stood by and let this happen. I want to assure you that – this isn't the case, and that the ads are far from the truth.

I've asked the City Manager to investigate and report back to the Council its findings in this matter. He has done so and has given the Council copies of the approval of minutes that back up his findings. I want to go over his findings with you at this time.

The City Council then had a lengthy discussion about the allegations in Kerley's political ads, with Wyatt requesting that the City Manager and City Clerk present certain information, including past Council meeting minutes, in an attempt to discredit the statements in the ads. Kerley responded with other information, trying to defend his allegations.

Near the end of the discussion, the following exchange took place:

WYATT: Now, you've read a letter from a former City Manager that's outrageous.

KERLEY: I just brought it to show. I didn't read it. If you want to read it, you can read it.

WYATT: Now, he was discharged from City Manager up here because of misappropriating funds and not following procedures. And then you want to bring a letter up here from him with all kind of garbage here on it about me and the Mayor. It's totally out of order, in my opinion.

COUNCILMAN DUER: Did you say who the City Manager is? I want to get that – I don't want to reflect on another person.

WYATT: Pardon me, sir?

DUER: Please say who the City Manager is, the one you are talking about, the letter.

-3-

> WYATT: I think it's signed by Jack Miller, isn't it, Councilman?
>
> KERLEY: It sure was.

Kerley testified in his deposition that he had asked Miller to provide him a recommendation, or Miller's opinion of Graham. Miller's handwritten letter discussed at the meeting stated the following:

> In 30 plus years of public service, I have worked for 5 Governors, 12 Mayors, over 150 City Council Members, including the incumbent Mayor of the City of Crossville, and his challenger, Councilman Jesse Kerley. Mr. Kerley asked me to compare Mr. Graham with some of the other elected leaders of which I had served.
>
> In my honest evaluation, I believe that J.H. Graham, III, is the most ethically challenged, ego-mani[a]cal, narcissistic elected official I have ever known. He appeared, to me, to be interested only in serving his ego and the financial interests of his relatives and political allies. I believe th[at] Mr. Graham is incapable of altruistic thought or action!
>
> Bring back dignity, respect, intellectual integrity, to the office of Mayor. Elect Jesse Luke Kerley.

Kerley did not read Miller's letter at the meeting. He did bring copies of it to show to some or perhaps all of the other Council members.

Miller brought this defamation action against Wyatt, based solely on Wyatt's allegedly slanderous statement at the City Council meeting, *i.e.*, that Miller "was discharged from City Manager up here because of misappropriating funds and not following procedures."[2] The trial court granted Wyatt's motion for summary judgment, holding, among other things, that "[t]he undisputed facts demonstrate that the alleged defamatory statement made by defendant Wyatt 'arose from the conduct of the affairs' of the Crossville City Council, and, hence, Defendant Wyatt has immunity pursuant to Tenn. Code Ann. § 29-20-201(b)(1)." Miller timely filed a notice of appeal.

---

[2]Miller's complaint initially included other statements that he alleged were defamatory, but he later voluntarily dismissed his claims based on those other statements.

## II.

We address the following issues:

> (1) Whether the trial court erred in granting Wyatt summary judgment based upon the court's determination that the allegedly defamatory statement arose from the conduct of the affairs of the Crossville City Council and was therefore protected by legislative privilege.
>
> (2) Whether summary judgment was improperly granted in view of the fact that Wyatt failed to comply with Tenn. R. Civ. P. 56.03 by not providing specific citations to the record supporting his statement of material facts until two days before the motion hearing.

## III.

In reviewing the trial court's grant of summary judgment, we are guided by the following well-established standards as recently reiterated by the Supreme Court:

> A summary judgment is appropriate only when the moving party can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008). When ruling on a summary judgment motion, the trial court must accept the nonmoving party's evidence as true and resolve any doubts concerning the existence of a genuine issue of material fact in favor of the nonmoving party. *Shipley v. Williams*, 350 S.W.3d 527, 536 (Tenn. 2011) (quoting *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 84 (Tenn. 2008)). "A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)). "The granting or denying of a motion for summary judgment is a matter of law, and our standard of review is de novo with no presumption of correctness." *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010).

*Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013).

"Courts have the prerogative to decide as a matter of law whether statements are privileged." *Evans v. Nashville Banner Publ'g Co.*, No. 87-164-II, 1988 WL 105718 at *6 (Tenn. Ct. App. M.S., filed Oct. 12, 1988). There are no disputed issues of material fact in this case.

IV.

A.

The concept of legislative immunity is deeply rooted in American jurisprudence. The United States Supreme Court, in ***Bogan v. Scott-Harris***, 523 U.S. 44, 48-49 (1998), addressing the issue of whether local legislators are absolutely immune from suit under federal § 1983 for their legislative activities, observed that

> [t]he principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law. This privilege "has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries" and was "taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation." *Tenney v. Brandhove*, 341 U.S. 367, 372, 71 S.Ct. 783, 786, 95 L.Ed. 1019 (1951). The Federal Constitution, the Constitutions of many of the newly independent States, and the common law thus protected legislators from liability for their legislative activities.

The High Court, after conducting an examination of the common law from the mid-nineteenth century, concluded that

> [b]ecause the common law accorded local legislators the same absolute immunity it accorded legislators at other levels of government, and because the rationales for such immunity are fully applicable to local legislators, we now hold that local legislators are likewise absolutely immune from suit under § 1983 for their legislative activities.

*Id.* at 49.  The ***Bogan*** Court reviewed and applied several rationales for granting absolute immunity to local legislators engaged in legislative activity, including its observations that (1) "[r]egardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability," ***id.*** at 52; (2) "the time and energy required to defend against a lawsuit are of particular concern at the local level, where the part-time citizen-legislator remains commonplace," ***id.***; (3) "the threat of liability may significantly deter service in local government," ***id.***; and (4) "the ultimate check on legislative abuse – the electoral process – applies with equal force at the local level, where legislators are often more closely responsible to the electorate."  ***Id.*** at 53.

This Court, recognizing "the obvious policy determination that the importance of legislators freely speaking their minds outweighs the countervailing argument that those people who are defamed should be able to recover damages for injury to their reputations," held in ***Cornett v. Fetzer***, 604 S.W.2d 62, 63 (Tenn. Ct. App. 1980) that "an absolute privilege should be recognized in this state for remarks made by city council members which relate to matters within the scope of that body's authority." ***Id.***; *see also* ***Issa v. Benson***, No. E2012-01672-COA-R3-CV, 2013 WL 3227049 at *4-5 (Tenn. Ct. App. E.S., filed June 24, 2013) (following ***Cornett*** and holding city councilman's statements to other council members prior to meeting are protected by absolute legislative privilege).

The Tennessee General Assembly adopted and codified the common law legislative privilege for city council members and other legislators at the local level when it amended the Governmental Tort Liability Act ("the GTLA") in 1986 to provide the following:

> (1) The general assembly finds and declares that the services of governmental entity boards, commissions, authorities and other governing agencies are critical to the efficient conduct and management of the public affairs of the citizens of this state. Complete and absolute immunity is required for the free exercise and discharge of the duties of such boards, commissions, authorities and other governing agencies. Members of boards, commissions, authorities, and other governing agencies must be permitted to operate without concern for the possibility of litigation arising from the faithful discharge of their duties.
>
> (2) All members of boards, commissions, agencies, authorities, and other governing bodies of any governmental entity, created by public or private act, whether compensated or not, shall be immune from suit arising from the conduct of the affairs of such

board, commission, agency, authority, or other governing body. Such immunity from suit shall be removed when such conduct amounts to willful, wanton, or gross negligence.

Tenn. Code Ann. § 29-20-201(b).

Although the legislative privilege is absolute, and bars a defamation claim when it is held to apply, it is not without limits. The privilege " 'does not give a member of a subordinate legislative body the right to use his or her position as a forum for private slanders against others.' " *Issa*, 2013 WL 3227049 at \*4 (quoting *Cornett*, 604 S.W.2d at 63). Because a reason supporting the legislative privilege is " 'to insure an uninhibited debate concerning matters before a legislative body, it follows that such a privilege is applicable only if the defamatory remarks are made relating to matters within the scope of that body's authority.' " *Id.* In *Bogan*, the U.S. Supreme Court framed the issue this way:

> Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity." . . . Although the [federal] Court of Appeals did not suggest that intent or motive can overcome an immunity defense for activities that are, in fact, legislative, the court erroneously relied on petitioners' subjective intent in resolving the logically prior question of whether their acts were legislative.

> Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. The privilege of absolute immunity "would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Tenney*, 341 U.S., at 377, 71 S.Ct., at 788 (internal quotation marks omitted). Furthermore, it simply is "not consonant with our scheme of government for a court to inquire into the motives of legislators."

> \*    \*    \*

> This leaves us with the question whether, stripped of all considerations of intent and motive, petitioners' actions were legislative.

-8-

***Bogan***, 523 U.S. at 54-55.  The GTLA similarly provides immunity only for "suit arising from the conduct of the affairs of such board, commission, agency, authority, or other governing body."  Tenn. Code Ann. § 29-20-201(b)(2).

In the present case, Miller argues that Wyatt's allegedly defamatory statement that Miller had been discharged as City Manager because of "misappropriating funds" did not arise from the conduct of the affairs of the Crossville City Council.  In his brief, Miller argues that "electioneering and politics are fine, but politicians who are also government officials do not receive the protection afforded government officials in conducting the affairs of the government merely because the politician/official attempts to improperly insert electioneering and politics into the time and space that should be devoted to the affairs of the government."

This Court was recently presented with similar arguments in ***Issa***, where a city councilman, Benson, was sued by Issa for allegedly telling other council members before the meeting that Issa had offered him a bribe in an attempt to influence a rezoning vote.  2013 WL 3227049 at *1.  The trial court granted Benson's motion for judgment on the pleadings on the ground of legislative privilege.  Issa appealed.  Affirming the trial court, we stated the following:

> Issa argues that Benson's statements are not protected by the legislative privilege because, in part, they were not made during a regularly-scheduled, open meeting of the Chattanooga City Council.  Issa points out that in ***Cornett***, the allegedly defamatory remarks were made during a regularly-scheduled, open city council meeting.  We, however, do not believe this is a decisive distinction. . . . [O]ur inquiry centers on the nature and scope of the statements at issue vis-a-vis Benson's legislative functions.  Issa argues essentially that Benson's remarks were gratuitous, and beyond the scope of a legitimate legislative function.  Additionally, Issa argues that bribery is not, per se, part of the legislative function in regards to rezoning issues.

> Issa's arguments are unavailing.  Issa takes what we believe to be an unwarranted and extremely narrow view of what constitutes legislative function.  The same policy reasons . . . for applying the legislative privilege to a legislative body such as the Chattanooga City Council are just as applicable to Benson's statements to his fellow council members as it would have been

if he had made the same statement to those same council members in a regular scheduled open meeting of the Chattanooga City Council. While bribery of a public official is, of course, illegal and thus never officially part of a city council's legislative agenda, a city council may well have a legitimate basis for knowing whether individuals seeking certain actions from the council have attempted to secure support by illegal means. Whether an individual attempts to bribe a council member in order to influence a vote surely is relevant information for the council to consider in weighing that vote. While we take no position on the truth of Benson's allegations, we do hold that they are of a legislative character under the allegations of Issa's complaint. Having decided that, we do not probe into Benson's motivations. We hold that Benson's allegations fell within the scope of his legislative function and are protected by the legislative privilege.

*Issa*, 2013 WL 3227049 at *4-5.

In this case, the allegedly defamatory statement was made in the course of a regularly scheduled, open meeting of the Crossville City Council. This factor, while not dispositive under our ruling in *Issa*, nonetheless weighs in favor of applying legislative privilege, and brings the facts of this case closer to those in *Cornett*. Moreover, a majority of the council voted to reject the attempt to remove Item #8 from the agenda, reflecting a majority view that the topic of the political advertisements was an appropriate matter for discussion. We do observe generally that if a city council member becomes aware of allegations of impropriety by a city employee, it would fall within the legitimate business of the council to discuss and investigate the allegations. We hold that, under the circumstances here, Wyatt's statement arose from the conduct of the affairs of the Crossville City Council, fell within the scope of his legislative function, and therefore was cloaked with immunity. Having decided that, we do not probe into Wyatt's intentions or motivations. *Issa*, 2013 WL 3227049 at *5; *Bogan*, 523 U.S. at 55 (stating "it simply is not consonant with our scheme of government for a court to inquire into the motives of legislators") (internal quotation marks omitted).

B.

Miller argues that the trial court's summary judgment also should be reversed because, he argues, Wyatt failed to comply with the requirements of Tenn. R. Civ. P. 56.03, which provides in pertinent part:

> In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Rule 56 of the Tennessee Rules of Civil Procedure shall be accompanied by a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record.

Miller argues that "although Wyatt met the 30-day deadline for filing a motion for summary judgment, he did not comply with the requirement of [Rule 56.03] that each statement of material fact upon which the movant relies be supported by a specific citation to the record." Miller asserts that Wyatt did not provide specific citations to the record until Wyatt filed a brief in support of his summary judgment motion two days before the hearing. Wyatt argues that he complied with Rule 56.03 and that in any event, the trial court has broad discretion to waive the rule's requirements.

We agree with Wyatt that this is an issue that falls within the trial court's broad discretion. *See **Butler v. Diversified Energy, Inc.***, No. 03A01-9804-CV-00146, 1999 WL 76102 at *3 (Tenn. Ct. App. E.S., filed Jan. 28, 1999) (holding that "the provision of Rule 56.03 of the Tennessee Rules of Civil Procedure, directing a simple concise statement of the material facts to accompany any motion for summary judgment, is for the benefit of the trial court, and could be, as it was in this case, waived"); *see also **Newell v. Maitland***, No. W2007-01704-COA-R3-CV, 2008 WL 2122331 at *8 (Tenn. Ct. App. W.S., filed May 21, 2008). It was within the trial court's discretion to allow the summary judgment hearing to proceed as scheduled, despite Miller's argument that Wyatt had provided specific citations to the record only two days before the hearing. It would also have been within the court's discretion to allow more time if the court thought it was needed. In this case, where all of the facts pertinent to the dispositive issue of legislative privilege were captured on videotape and provided to the court, there was clearly no error in allowing the hearing to proceed as scheduled.

V.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, Jack E. Miller. This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE