FILED

07/22/2019

Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 6, 2019 Session

## TWB ARCHITECTS, INC. v. THE BRAXTON, LLC ET AL.

**Appeal by Permission from the Court of Appeals
Chancery Court for Cheatham County
No. 14181      David D. Wolfe, Judge**

———————————————————

**No. M2017-00423-SC-R11-CV**

———————————————————

We granted review to determine whether summary judgment was properly granted to an architect firm seeking to recover its design fees from a development company. The architect firm designed a condominium project for the development company. The development company ran short of funds and was not able to pay the architect firm under their design contract. As a result, the architect firm's president agreed to accept a condominium in the project instead of the fee. But the development company did not fulfill that agreement because the development company had pledged the condominium as collateral for a construction loan. The architect firm filed a mechanic's lien for its unpaid fee under the parties' design contract, and then filed this suit to enforce the lien. The trial court granted summary judgment to the architect firm, holding that the firm was entitled to its fee under the design contract, and there was insufficient evidence that the parties intended a novation by substituting the agreement to convey a condominium for the design contract. The Court of Appeals affirmed. We find that disputed questions of material fact exist about whether the architect firm and the development company intended a novation when they entered into the agreement for the condominium. Thus, the trial court should not have granted summary judgment to the architect firm. We reverse and remand to the trial court.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Reversed; Judgment of the Trial Court Reversed;
Remanded to the Trial Court**

SHARON G. LEE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., CORNELIA A. CLARK, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

William R. O'Bryan, Jr., and Kevin C. Baltz, Nashville, Tennessee, for the appellants, The Braxton, LLC, and Fidelity and Deposit Company of Maryland.

Donald N. Capparella, Nashville, Tennessee, for the appellee, TWB Architects, Inc.

# OPINION

## *Background*

In February 2005, TWB Architects, Inc., through its president and sole owner, Timothy W. Burrow, signed an agreement ("Architect Agreement") with Progress Capital Partners, LLC, through its sole member and chief manager, John Rankin. Under the Architect Agreement, TWB Architects agreed to provide design services for the construction of a condominium complex, known as "The Braxton," in Ashland City. Progress Capital Partners agreed to pay TWB Architects a fee for its design services based on two percent of the construction costs for the project, with progress payments based on an hourly rate billed monthly before construction.[1]

Progress Capital Partners failed to obtain sufficient financing for the project. In early May 2005, Mr. Rankin advised Mr. Burrow that the construction budget could not cover TWB Architects' fee. Mr. Rankin proposed that Mr. Burrow accept a condominium in the project as payment for the architect firm's fee. Mr. Burrow, with the consent of TWB Architects, agreed.

Later, Progress Capital Partners deeded the property on which the project was located to The Braxton, LLC ("Braxton"), a company formed by Mr. Rankin.[2] On February 16, 2006, Braxton and Mr. Burrow agreed in writing ("Condominium Agreement") for Mr. Burrow to buy Penthouse P6 for "$0 in consideration of design fees owed in contract for architecture design" between Progress Capital Partners and TWB Architects dated February 17, 2005. Mr. Burrow, with TWB Architects' consent, signed as purchaser and Mr. Rankin signed as seller for Braxton.[3] Attached and incorporated

---

[1] Section 11.2.4 of the Architect Agreement details TWB Architects' fee arrangement:

Progress payments will be made based on $150 per hour, plus expenses, but with a maximum of two (2) percent of construction costs. At the end of the Architect's Basic Services, if the amount paid is less than two (2) percent of the construction costs, payment will be made for the difference at the time the Owner begins construction. If the project is not constructed, there will be no obligation to pay more than $150 per hour, plus expenses.

[2] In January 2007, Charles Elcan became a member of Braxton. Mr. Elcan became the sole member when Mr. Rankin surrendered his membership interest in September 2008.

[3] The Condominium Agreement was not the first time TWB Architects had consented to Mr. Burrow being given consideration for TWB Architects' fees. Mr. Rankin had also signed the Architect Agreement as managing general partner of the Ashland Company. The Architect Agreement provided that one-third of TWB Architects' design fee could be applied as credit against any mortgage balances owed

into the Condominium Agreement was a copy of the Architect Agreement, showing that TWB Architects' fee supported the zero dollar purchase price. Under the Condominium Agreement, the closing of the sale would be on or before August 4, 2008, with an option for Braxton to extend that date for up to ninety days.

After June 2005, TWB Architects stopped sending Braxton monthly invoices for progress payments. By May 2006, TWB Architects had substantially completed its design work. During construction of the project, Mr. Rankin routinely submitted Loan Advance Requisition forms and Sworn Owner's Statements to the bank financing the project. Mr. Rankin signed the Sworn Owner's Statements, verifying that there were no unpaid architect fees because he understood there were no fees owed to TWB Architects based on the Condominium Agreement.

During construction of the project, Mr. Burrow spent nearly $40,000 for upgrades to Penthouse P6, which he referred to as "my penthouse." He corresponded with the general contractor and with Mr. Rankin about specific upgrades to customize Penthouse P6, which included cabinets, granite, tile, lighting, mantles, hearths, doors, wiring, and a unique floorplan.

On November 3, 2008, the day before the extended closing deadline under the Condominium Agreement, Mr. Burrow wrote to Mr. Rankin demanding to close the next day. In addition, Mr. Burrow stated that if Braxton failed to meet the closing deadline, then Mr. Burrow would treat the Condominium Agreement "as continuing in full force and effect, and require specific performance of [Braxton] to deliver a deed." He mentioned neither the Architect Agreement nor the design fee.

A week later, Mr. Burrow wrote to Mr. Rankin to clarify "instead of TWB Architects, Inc. receiving cash for the design fee of 2 percent of construction cost as set forth in the . . . [Architect Agreement], I will be given Penthouse P6 and the boat slip." He asked Mr. Rankin to sign at the bottom of the letter to confirm the terms stated in the letter, but Mr. Rankin did not do so.

On November 11, 2008, Mr. Burrow emailed Mr. Rankin, asking whether he had told the bank that the proceeds from the condominium sale to Mr. Burrow would be zero dollars. Mr. Rankin replied that he had told the bank that Mr. Burrow would need to be paid two percent or receive his condominium unit, and that Mr. Burrow had invested tens of thousands of dollars in the condominium. Mr. Rankin later admitted in a 2010

by Mr. Burrow to Mr. Rankin or the Ashland Company if Mr. Burrow exercised his option under a lease/purchase agreement to purchase condominium units that he was leasing from the Ashland Company.

deposition that he told the bank something different—that Mr. Burrow was "our design architect, and he's getting this unit for his fees."

On November 25, 2008, Mr. Burrow wrote to Robert Holland, an attorney for Braxton, stating that Mr. Burrow had entered into a Condominium Agreement for Penthouse P6 that was set to close on December 8, 2008, and that he was concerned about the incomplete swimming pool at the condominium complex. On December 12, 2008, Mr. Burrow wrote again to Mr. Holland explaining that he had rented his home to a tenant who planned to move in on December 18, 2008. In that letter, Mr. Burrow stated that in the Condominium Agreement, Braxton had granted its rights to Penthouse P6 to Mr. Burrow and thus Braxton had "no rights to the condominium to grant, as security for a loan or otherwise, and any attempt to do so would be voidable."

On December 27, 2008, Mr. Burrow moved into Penthouse P6 although there had been no closing. He later advertised it for rent "by owner" and leased it for a short time before moving back in and using the condominium as his personal residence. On January 2, 2009, Mr. Burrow wrote to Mr. Holland stating that he had moved into his penthouse and that "it [was] beautiful." He also expressed concern that sales of other units had not closed, the condominium complex looked like a "ghost town," and potential buyers might back out. Mr. Burrow offered his services as an attorney to assist with the situation, stating he would "invest my time to protect my investment in my penthouse."[4]

On January 6, 2009, Mr. Burrow emailed Mr. Rankin asking if there was any reason why he should not send a letter to Mr. Holland again requesting to close on the condominium and stating that "[t]he condo is my payment for architectural work done on The Braxton, and until closing occurs, I have insufficient security for being paid." Mr. Burrow did not send the proposed letter; instead, the next day he wrote Mr. Holland asking when Braxton intended to complete his condominium, emphasizing that he wanted to close on it as soon as possible. Mr. Burrow gave Mr. Holland until Friday, January 9, 2009, to provide a date for closing or to provide a reason why closing could not occur by the end of the following week, January 16, 2009.

On January 13, 2009, Mr. Burrow, suspecting that Braxton would not deed the condominium to him, notified Mr. Holland in writing that TWB Architects had retained Mr. Burrow's firm to represent it concerning services provided by TWB Architects under the Architect Agreement. Mr. Burrow stated that TWB Architects had a claim against the owner of the project for $882,526.14, which was two percent of the construction cost.[5]

---

[4] Mr. Burrow, an architect and attorney, operated TWB Architects out of his Nashville law office.

[5] Mr. Rankin had provided this information to Mr. Burrow by email that same day.

- 4 -

Mr. Burrow also stated that if the claim was satisfied by January 19, 2009, or if Braxton provided proper assurances it would be satisfied, then TWB Architects would not file a mechanic's lien. Mr. Burrow further noted that Braxton could satisfy the claim by transferring ownership of Penthouse P6 to him. This letter, written on Mr. Burrow's law firm letterhead, was the first time that Mr. Burrow mentioned the Architect Agreement or the fee in his communications with Mr. Holland.

On January 22, 2009, Mr. Burrow wrote Mr. Rankin purporting to state their understanding when they entered into the Condominium Agreement. This letter differs significantly from the letter Mr. Burrow had written on November 10, 2008, for the same stated purpose. In the January 2009 letter, Mr. Burrow said that the Condominium Agreement was intended to provide an additional means to pay for the services of TWB Architects. He further claimed that if for any reason Braxton did not comply with the Condominium Agreement, Mr. Burrow could unilaterally decide whether to seek specific performance under the Condominium Agreement or payment of the design fee under the Architect Agreement. Mr. Burrow asked Mr. Rankin to sign at the bottom of the letter confirming its accuracy, and this time Mr. Rankin did so. But Mr. Rankin later denied his ratification of this letter, explaining that since he was no longer a member of Braxton in January 2009, he was not in a position to bind Braxton to the contract, and that the contract documents said nothing about Mr. Burrow unilaterally deciding between two alternate forms of payment.

On January 23, 2009, Mr. Burrow wrote Mr. Holland about a telephone conversation on January 15, 2009, in which Mr. Holland had explained that the closing on the condominium was delayed because the bank had an assignment on the sales contracts, and there was no challenge to TWB Architects or Mr. Burrow's position about having the condominium deeded to him.[6] Mr. Burrow stated that he would be filing a mechanic's lien against the property on February 3, 2009, unless he received written assurance that Braxton would deed the condominium to him.

On February 23, 2009, Mr. Burrow emailed Mr. Holland to advise him that Mr. Burrow was ready to close that week on the condominium even though certain items, such as appliances, carpet, and shelving were unfinished. He also stated that in two days TWB Architects would be filing a lien, which it could release at closing and that TWB Architects reserved its right to take cash for the $882,526.14 fee rather than have the condominium deeded to Mr. Burrow. Finally, he stated that "taking cash becomes a more attractive option, if not the only viable option, as time passes on."

---

[6] Mr. Holland has disputed this account of their telephone conversation. He testified that Braxton had always acknowledged its obligation to deed the condominium to Mr. Burrow, but also had always asserted that TWB Architects had no right to its design fee because of the Condominium Agreement.

On February 25, 2009, Mr. Burrow learned from an attorney for the bank that Braxton had pledged his condominium as part of the collateral for the construction loan. The next day, TWB Architects filed a mechanic's lien for its two percent design fee in the amount of $882,526.14 (later revised to $888,258.18) as provided for in the Architect Agreement. Mr. Burrow lived in Penthouse P6 until moving out in late 2009 after the Chancery Court for Davidson County in May 2009 gave a receiver the right of possession to every condominium in the project, including Penthouse P6.

### *Litigation – TWB I*

In March 2009, while Mr. Burrow was still living in Penthouse P6, TWB Architects sued Braxton to enforce its lien.[7] Fidelity and Deposit Company of Maryland, the obligor on the surety bond Braxton filed to discharge the lien, was added as a defendant in April 2009. We refer to the defendants collectively as "Braxton."

In January 2013, Braxton moved for summary judgment based, in part, on the affirmative defense of novation, arguing that the Condominium Agreement substituted for the Architect Agreement and thus extinguished TWB Architects' right to its fee under the Architect Agreement. Braxton supported the motion for summary judgment with several exhibits, including Mr. Rankin's June 11, 2009 affidavit and excerpts from his March 23, 2010 deposition.

In his affidavit signed on June 11, 2009, Mr. Rankin stated that the parties intended for the obligations under the Condominium Agreement to substitute for the obligations under the Architect Agreement. He also stated that all parties understood that the Condominium Agreement would discharge all obligations owed under the Architect Agreement and would extinguish all rights of the parties under the Architect Agreement.

Mr. Rankin's March 23, 2010 deposition tracked his June 2009 affidavit. He testified that the purpose of his affidavit had been to state that the parties intended for the Condominium Agreement to create a novation and to clear up any confusion caused by his correspondence with Mr. Burrow. Mr. Rankin wanted to make clear that Mr. Rankin intended to pay TWB Architects' fee by conveying the condominium to Mr. Burrow instead of paying the architect fee because of insufficient funding. Mr. Rankin testified that the Architect Agreement was no longer the agreement between the parties, and that

---

[7] Less than a month later, in April 2009, Mr. Burrow sued Braxton for breach of the Condominium Agreement, demanding either specific performance by conveying the condominium to Mr. Burrow or a declaratory judgment that the Condominium Agreement had not been a novation and the parties, including TWB Architects, retained their pre-Condominium Agreement rights. In September 2014, the lawsuit was dismissed with prejudice for failure to prosecute.

the Condominium Agreement replaced the obligations under the Architect Agreement, causing a novation.

Mr. Rankin claimed that even though he had signed the bottom of Mr. Burrow's letter dated January 22, 2009, as requested, the contract documents did not say anything about Mr. Burrow unilaterally choosing which payment method to accept. Mr. Rankin also testified that he thought Mr. Burrow decided he needed to set forth a different intent than the one he had expressed in his letter dated November 10, 2008, because by January 2009, it looked like he would have trouble getting his condominium. Mr. Rankin explained that Braxton had pledged Penthouse P6 along with other condominium units to the bank as collateral, but he and Mr. Burrow thought the condominium would be available to Mr. Burrow after Braxton paid the bank. Mr. Rankin characterized it as "just a bad credit decision, a bad economic reality" that Mr. Burrow did not get his condominium, and Mr. Rankin said he was sorry for that.

TWB Architects filed a cross-motion for summary judgment, supported by Mr. Burrow's affidavit attesting that he never intended for TWB Architects to relinquish its right to payment if Braxton did not deed the condominium to Mr. Burrow; he and Mr. Rankin never discussed whether the conveyance of the condominium would extinguish TWB Architects' rights under the Architect Agreement; TWB Architects never agreed to surrender its rights under the Architect Agreement and was never asked to do so; and Mr. Burrow never even considered that anyone would contend that if he received nothing, TWB Architects would also receive nothing.[8]

The trial court granted Braxton's motion for summary judgment and denied TWB Architects' cross-motion, holding that the Condominium Agreement created a novation. The Court of Appeals reversed the trial court's ruling and remanded the case, finding that the record contained facts from which a reasonable person could conclude that Mr. Burrow and Mr. Rankin did not intend to create a novation with the Condominium Agreement. *TWB Architects, Inc. v. Braxton, LLC*, No. M2013-02740-COA-R3-CV, 2014 WL 5502401, at *5–6 (Tenn. Ct. App. Oct. 30, 2014).

### *Litigation – TWB II*

After the Court of Appeals remanded the case, Mr. Rankin changed his testimony, siding with TWB Architects and claiming there was no novation. Testimony from the

---

[8] Mr. Burrow's affidavit was supported by exhibits, including email correspondence between Mr. Burrow and Mr. Rankin dated November 11, 2008, and January 13, 2009; the Notice of Lien Claim Modification filed in August 2009; and a boundary survey of the project.

November 2015 supplemental depositions of Mr. Rankin and Mr. Burrow reveals that in October 2011, Mr. Rankin was arrested in Cheatham County on bad check charges. Mr. Burrow visited Mr. Rankin in jail, provided "emotional support," and contributed money to a fund that had been set up to help Mr. Rankin hire a lawyer and get out of jail. In September 2013, Mr. Burrow paid $5,000 to help with Mr. Rankin's legal expenses. Next, Mr. Burrow loaned Mr. Rankin $48,000.[9] Later, when Mr. Rankin needed more funds to pay restitution, have his record expunged, avoid spending more time in jail and risking a criminal trial, Mr. Burrow advanced $36,500 through Mr. Rankin's attorney to the Cheatham County Circuit Court Clerk. A loan agreement, dated December 23, 2013, provided that an "anonymous entity" had advanced $84,500 to Mr. Rankin. The anonymous entity was Mr. Burrow, and the amount of the loan represented payments of $48,000 to Mr. Burrow and $36,500 for costs relating to Mr. Rankin's criminal charges.

After receiving Mr. Burrow's payments of over $84,000, Mr. Rankin no longer believed that the parties intended a novation with the Condominium Agreement. On February 8, 2013, Mr. Rankin signed an affidavit, at Mr. Burrow's request, to "clarify" his prior testimony. In this affidavit, Mr. Rankin denied that he and Mr. Burrow had ever discussed that the obligations under the Condominium Agreement would extinguish the Architect Agreement. Mr. Rankin then signed additional affidavits, again at Mr. Burrow's request, contradicting sworn statements in Mr. Rankin's 2009 affidavit and 2010 deposition. In his 2015 deposition, Mr. Rankin insisted that the parties intended for the Condominium Agreement to discharge all obligations owed under the Architect Agreement *only* if the obligations under the Condominium Agreement were satisfied with the condominium being deeded to Mr. Burrow. Mr. Rankin also stated that he had misunderstood the meaning of novation when he gave his 2010 deposition. Mr. Rankin signed affidavits to the same effect on May 5, 2014, and August 26, 2014.

In March 2016, TWB Architects filed a motion for summary judgment supported by exhibits, including a copy of the Architect Agreement; Mr. Burrow's April 2013 and July 2013 affidavits; and Mr. Rankin's June 2009 affidavit.

The trial court[10] granted TWB Architects' motion for summary judgment. Braxton appealed, arguing, in part, that a reasonable jury could find that the Condominium

---

[9] The date of this loan is unclear, but a reference to the loan in a letter from Mr. Rankin to Mr. Burrow suggests that Mr. Burrow made the loan before November 22, 2013.

[10] Chancellor Robert E. Burch, who had granted summary judgment in *TWB I*, retired while *TWB I* was pending in the Court of Appeals. On remand, Circuit Court Judge David D. Wolfe heard the case.

Agreement was a novation.[11] The Court of Appeals affirmed summary judgment in favor of TWB Architects, holding that Braxton could not establish novation because based on Mr. Burrow's affidavits and deposition testimony, there was no evidence that he intended a novation. *TWB Architects, Inc. v. Braxton, LLC*, No. M2017-00423-COA-R3-CV, 2018 WL 638251, at *6–7 (Tenn. Ct. App. Jan. 31, 2018).

### *Analysis*

The primary issue we address in this appeal is whether the trial court properly granted summary judgment to TWB Architects. Before we begin our review of this issue, we need to clarify our scope of review, state the applicable summary judgment standard, and resolve TWB Architects' argument that Braxton did not comply with Tennessee Rule of Civil Procedure 56.03.

### *Scope of Review*

Our scope of review on appeal is limited to the issues raised in Braxton's Tennessee Supreme Court Rule 11 application for permission to appeal. A party who fails to adequately raise an issue in a Rule 11 application waives the issue. *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). In its Rule 11 application, Braxton only raised the novation issue, with a passing mention of waiver. As a result, we do not consider arguments related to the affirmative defenses of waiver, merger, and willful exaggeration of lien that Braxton raised in its briefs, but failed to include in its Rule 11 application.

### *Summary Judgment Standard*

A trial court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. In reviewing a trial court's ruling on a motion for summary judgment, we make a fresh determination about whether the requirements of Rule 56 have been met. *Rye v. Women's Care Ctr. of Memphis*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013)). Our review of the trial court's ruling is de novo, with no presumption of correctness. *Id.* (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Abshure v. Methodist Healthcare-Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010)). On review, we accept the evidence presented by Braxton, the nonmoving party, as true; allow all reasonable inferences in its favor; and resolve any doubts about the existence of a

---

[11] The Court of Appeals ruled for TWB Architects on Braxton's other asserted affirmative defenses, but those defenses are not at issue.

genuine issue of material fact in favor of Braxton. *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000); *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)); *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 844–45 (Tenn. 2010).

In *Rye*, we stated our holding as follows:

> [W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye*, 477 S.W.3d at 264.

In *Rye*, we intended to "correct course, overrule *Hannan* [v. *Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008)], and fully embrace the standards articulated in the *Celotex* trilogy." *Id. Hannan's* summary judgment standard that "a moving party who [does not bear the burden of proof at trial] must either (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim *at trial*" had proven to be unworkable. *Hannan*, 270 S.W.3d at 8–9 (emphasis added).

We intended for the summary judgment standard adopted in *Rye* to apply to all parties, no matter which party filed the motion for summary judgment. Here, the Court of Appeals incorrectly stated that the *Hannan* summary judgment standard, not the *Rye* standard, applies when the plaintiff files a motion for summary judgment. *TWB Architects, Inc.*, 2018 WL 638251, at *4 n.6 (citing *Cardinal Health 108, Inc. v. E. Tenn. Hematology-Oncology Assocs., P.C.*, No. E2015-00002-COA-R3-CV, 2016 WL 158090, at *2 n.1 (Tenn. Ct. App. Jan. 14, 2016)). The Court of Appeals, however, correctly applied the *Rye* burden shifting analysis for the moving party who does not bear the burden of proof at trial because Braxton had the burden of proving its affirmative defenses. We clarify here that the *Hannan* summary judgment standard is not applicable in any case, without regard to whether the moving party is a plaintiff or a defendant. In *Rye*, the defendants were the moving parties, and we therefore stated our holding in terms of a case in which the moving party does not bear the burden of proof at trial. In *Rye*, we overruled *Hannan* and fully embraced the standards set forth in the *Celotex* trilogy. It was necessary to overrule *Hannan* because a court ruling on a summary judgment motion under *Hannan* was required to assume that the nonmoving party might, at some point before trial, be able to come up with evidence to support its claim. *Rye*, 477 S.W.3d at

261 (citing *Boals v. Murphy*, No. W2013-00310-COA-R3-CV, 2013 WL 5872225, at *15 (Tenn. Ct. App. Oct. 30, 2013)). That summary judgment standard essentially "[drove] a stake through the heart of summary judgment in Tennessee." *Id.* at 260 (quoting Judy M. Cornett, *Trick or Treat? Summary Judgment in Tennessee after Hannan v. Alltel Publishing Co.*, 77 Tenn. L. Rev. 305, 306 (2010)). This unworkable standard is what *Rye* sought to correct.

*Rye* does not specifically address, as *Hannan* did in a footnote, the burden of production when the moving party has the burden of proof at trial. However, in a dissenting opinion in *Celotex* aimed at explaining more clearly the law on summary judgment, Justice Brennan explained that if the moving party bears the burden of proof on the challenged claim at trial, that party must produce at the summary judgment stage evidence that, if uncontroverted at trial, would entitle it to a directed verdict. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting) (citations omitted). The burden then shifts to the nonmoving party to produce evidence showing that there is a genuine issue of fact for trial. *Id.* On the other hand, when the nonmoving party has the burden of proof at trial, the burden shifting is the same as that set forth by this Court in *Rye*—the moving party may either negate an essential element of the nonmoving party's claim or show that the nonmoving party does not have sufficient evidence to prove an essential element of its claim. *Id.* (citations omitted).

By stating its holding in terms of the burden shifting framework applicable when the nonmoving party does not bear the burden of proof at trial, the Court in *Rye* did not intend to change this burden shifting framework or to exclude from its holding the burden shifting framework described by Justice Brennan when the nonmoving party bears the burden of proof at trial. The emphasis under the *Rye* standard is the evidence *at the summary judgment stage*. Whether the nonmoving party is a plaintiff or a defendant— and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, "[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." *Rye* at 265. This is the standard Tennessee courts must apply when ruling on summary judgment motions regardless of which party bears the burden of proof at trial.[12]

---

[12] In *Cardinal Health*, the Court of Appeals noted that the *Hannan* standard, not the *Rye* standard, applied because the plaintiff had moved for summary judgment. 2016 WL 158090, at *2 n.1. The Court of Appeals similarly stated in *Avery Place, LLC v. Highways, Inc.*, No. M2014-02043-COA-R3-CV, 2015 WL 8161848 (Tenn. Ct. App. Dec. 7, 2015) that *Rye* overruled the *Hannan* burden shifting framework when the moving party does not bear the burden of proof at trial, but did not change the framework when the moving party bears the burden of proof at trial. 2015 WL 8161848, at *5 n.5 (citing *Rye*). These cases, and any other case setting forth a summary judgment analysis inconsistent with *Rye*, should not be relied on.

*Tennessee Rule of Civil Procedure 56.03*

TWB Architects argues that Braxton did not comply with Rule 56.03[13] because its citations to the record in response to TWB Architects' statement of undisputed material facts were not specific enough, and thus improperly required the trial court to identify which facts were in dispute and which page in the record contained those facts. We disagree. The trial court had the discretion to waive the requirements of Rule 56.03 if it found Braxton's responses insufficient. *Miller v. Wyatt*, 457 S.W.3d 405, 412 (Tenn. Ct. App. 2014) (citing *Butler v. Diversified Energy, Inc.*, No. 03A01-9804-CV-00146, 1999 WL 76102, at *3 (Tenn. Ct. App. Jan. 28, 1999); *Newell v. Maitland*, No. W2007-01704-COA-R3-CV, 2008 WL 2122331, at *8 (Tenn. Ct. App. May 21, 2008)). TWB Architects made this argument in the trial court, and the trial court proceeded on the merits of the motion, suggesting that either it found Braxton's response sufficient or, in its discretion, waived the requirements of the rule. *See id.* We find no abuse of discretion by the trial court.

TWB Architects also contends that the Court should disregard facts in Braxton's brief that Braxton failed to include in its response to TWB Architects' Rule 56.03 statement of undisputed material facts. We find no merit to this argument. Braxton was required in its brief to "set[] forth the facts relevant to the issues presented for review with appropriate references to the record." Tenn. R. App. P. 27(a)(6). Braxton's brief contains a statement of the facts it contends are relevant to the issues presented for review and supports them with appropriate references to the record.

*Novation*

The primary issue here is whether the trial court properly granted summary judgment to TWB Architects. Braxton argues that TWB Architects was not entitled to summary judgment because the parties created a novation by executing the Condominium Agreement with the intent that it would substitute for and replace the Architect Agreement. TWB Architects responds that the mechanic's lien for its fee under the Architect Agreement is enforceable and that the parties did not intend for the Condominium Agreement to extinguish and replace the Architect Agreement.

---

[13] Rule 56.03 requires a party moving for summary judgment to file a "separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." The nonmoving party must respond to each fact by agreeing that it is undisputed, agreeing that it is undisputed only for purposes of ruling on the motion for summary judgment, or showing that the fact is disputed with a specific citation to the record. Tenn. R. Civ. P. 56.03.

Novation is the substitution of a new obligation for an existing one or the substitution of a third party for the existing obligor. 30 *Williston on Contracts* § 76:1 (4th ed.) (May 2019 Update); s*ee also* 58 Am. Jur. 2d *Novation* § 1 (May 2019 Update) (defining "novation" as "a mutual agreement between the parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation or by the substitution of one debtor or of one creditor for another"). The Restatement (Second) of Contracts and some other sources distinguish between "novation" and "substituted contract,"[14] but courts in Tennessee have historically used them synonymously. *See, e.g., Pacific Eastern Corp. v. Gulf Life Co.*, 902 S.W.2d 946, 958 (Tenn. 1995) (citing *Sharp v. Fly*, 68 Tenn. 4, 10 (1876); *Blaylock v. Stephens*, 258 S.W.2d 779, 781 (Tenn. Ct. App. 1953); Restatement (Second) of Contracts § 280 (1979); 15 Samuel Williston, *A Treatise on the Law of Contracts* § 1865 at 585, 587 (3d ed. 1972)); *Rhea v. Marko Constr. Co.*, 652 S.W.2d 332, 334 (Tenn. 1983); *Crabb v. Cole*, 84 S.W.2d 597, 600 (Tenn. Ct. App. 1935); *Henry v. Nubert*, 35 S.W. 444, 447–48 (Tenn. Ch. App. 1895).[15]

The effect of a novation is that the original contract becomes a nullity, and the new agreement determines the rights and duties of the parties. The parties cannot revert back to the extinguished contract even if one party later breaches the new agreement. 66 C.J.S. *Novation* § 29 (June 2019 Update); *see also Pacific Eastern*, 902 S.W.2d at 959 (citing

[14] The Restatement (Second) of Contracts defines "substituted contract" as one that "is itself accepted by the obligee in satisfaction of the obligor's existing duty." Restatement (Second) of Contracts § 279 (1981) (June 2019 Update). It defines "novation" as a specific type of substituted contract—one that includes as a party one who was neither the obligor nor the obligee of the original duty. *Id.* § 280. *See also* Howard O. Hunter, *Modern Law of Contracts* § 19:34 (April 2019 Update) ("Although sometimes used interchangeably with the idea of substituted agreement, novation more commonly refers to a change in the identity of the contracting parties."); 66 C.J.S. *Novation* § 1 (June 2019 Update) (Although used interchangeably, there is a technical distinction between "substituted contract," which is an agreement accepted in satisfaction of the original contract, and "novation," which is a substituted contract "that includes a party who is not part of the original contract.").

[15] The trial court held that "there could not have been a novation because the parties to the two agreements are not the same." We disagree. The Architect Agreement was executed by Mr. Burrow as president of TWB Architects and by Mr. Rankin as chief manager of Progress Capital Partners. The Condominium Agreement was executed by Mr. Burrow and by Mr. Rankin on behalf of Braxton. In signing the Condominium Agreement, Mr. Burrow appeared to be acting on behalf of both himself and TWB Architects, of which he was the sole owner, because the Condominium Agreement specifically stated that the purchase price of zero dollars was "in consideration of design fees owed in contract for architectural design between Progress Capital Partners, LLC and TWB Architects, Inc." Likewise, at the time of the relevant agreements, Mr. Rankin was the sole member of Progress Capital Partners and Braxton, and the real property at issue was transferred from the former to the latter. As a result, the signatories to the two agreements do not defeat a novation. *See 84 Lumber Co. v. Smith*, 356 S.W.3d 380, 382 (Tenn. 2011) (a single signature may bind both an individual and a corporate entity); 1 Fletcher Cyclopedia of the Law of Corporations § 41.35 (September 2018 Update) ("Courts look very closely at a sole shareholder operation when the corporate form is used to obtain a privilege or avoid a duty.").

*Blaylock*, 258 S.W.2d at 781) ("A novation extinguishes the original contract."); *In re Cohen*, 422 B.R. 350, 372–73 (E.D.N.Y. 2010) (citing *Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622, 643 (S.D.N.Y. 1978), *aff'd*, 597 F.2d 314 (2d Cir. 1979)) ("A party injured by breach of a novation may only seek relief under the substitute agreement."); *In re Miller*, 54 B.R. 710, 712 (Bankr. D.N.D. 1985) (stating that after a novation, "the parties' obligations . . . are defined by the new agreement irrespective of whether the agreement is later breached").

The party seeking to establish a novation must show "(1) a previously valid obligation, (2) the agreement of all parties to a new contract, (3) the extinguishment of the old contract, and (4) a valid new contract." 21 Steven W. Feldman, *Tennessee Practice Series Contract Law and Practice* § 3:42 (May 2019 Update); *see also Crabb*, 84 S.W.2d at 600; 20 Tenn. Juris. *Novation* § 1 (2018). The most important factor in determining whether a novation has occurred is the intent of the parties, which must be clear and definite. 30 *Williston on Contracts* § 76:12; *see also In re O'Brien*, 154 B.R. 480, 485 (Bankr. W.D. Tenn. 1993) (citing *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 89 (Tenn. Ct. App. 1988)); *Commerce Union Bank v. Burger-In-A-Pouch, Inc.*, 657 S.W.2d 88, 90 (Tenn. 1983) (quoting *First Nat'l Bank of Sparta v. Hunter*, 125 S.W.2d 183, 187 (Tenn. Ct. App. 1938)).

A novation is never presumed. *Cent. State Bank v. Edwards*, 111 S.W.2d 873, 880 (Tenn. Ct. App. 1937) (citing *Sharp*, 68 Tenn. at 9; *Henry*, 35 S.W. at 448; *Braly v. Ragsdale*, 3 Tenn. App. 205, 210 (1926)). The party asserting a novation bears the burden of proof. *Rhea*, 652 S.W.2d at 334; *Dies v. Wilson Cnty. Bank*, 165 S.W. 248, 249 (Tenn. 1914); *Bank of Crockett*, 752 S.W.2d at 89; *Blaylock*, 258 S.W.2d at 781.

The parties need not express in written form their intent to create a novation, and the parties need not state orally or in writing the rescission of the original contract. *In re Edward M. Johnson & Assocs., Inc.*, 61 B.R. 801, 806 (Bankr. E.D. Tenn. 1986) (citing 58 Am. Jur. 2d *Novation* § 16 (1971); *Cent. State Bank*, 111 S.W.2d at 880), *aff'd in part, rev'd in part on other grounds*, 845 F.2d 1395 (6th Cir. 1988). Novation does not require express words such as "novation," "discharge," "extinguish," "settlement," or "release." 58 Am. Jur. 2d *Novation* § 11.

The intent to create a novation may be inferred from the facts and circumstances surrounding the transaction and from the conduct of the parties. *In re Edward M. Johnson*, 61 B.R. at 806 (citing 58 Am. Jur. 2d *Novation* § 16; *Central State Bank*, 111 S.W.2d at 880); *Bank of Crockett*, 752 S.W.2d at 89 (quoting 20 Tenn. Juris. *Novation* § 3 (1985)); *see also* 30 Williston on Contracts § 76:12. Although the parol evidence rule prohibits the use of extrinsic evidence to vary, contradict, or supplement the terms of an

- 14 -

integrated contract,[16] it is appropriate to consider evidence of surrounding facts and circumstances to determine the intent of the parties. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 697–98 (Tenn. 2019) (citing *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018)).

Thus, whether the parties intended a novation is ordinarily a question of fact that the trier of fact will determine. 30 *Williston on Contracts* § 76:43. The parties' intent about novation is only established, as a matter of law, when the evidence is such that reasonable minds cannot differ about the effect of the new agreement. *See Commerce Union Bank*, 657 S.W.2d at 90 (quoting *Hunter*, 125 S.W.2d at 187) (". . . whether a renewal note operates as a discharge of a note of which it is a renewal is dependent on the intention of the parties. It is a question of fact, not of law.").

Tennessee courts have cautioned that when the dispositive issue requires a determination of state of mind, "the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue." *McDowell v. Moore*, 863 S.W.2d 418, 421 (Tenn. Ct. App. 1992) (quoting *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir. 1970)); *see also HCA, Inc. v. Am. Prot. Ins. Co.*, 174 S.W.3d 184, 193 (Tenn. Ct. App. 2005) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)) (stating that summary judgment "is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense" because determining a state of mind "depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving"); *Anderson v. Mason*, 141 S.W.3d 634, 637 (Tenn. Ct. App. 2003) (citing *Poole v. First Nat'l Bank of Smyrna*, 196 S.W.2d 563, 568–69 (Tenn. Ct. App. 1946); *Price v. Allstate Ins. Co.*, 614 S.W.2d 377, 379 (Tenn. Ct. App. 1981); *Jennings v. Case*, 10 S.W.3d 625, 633 n.4 (Tenn. Ct. App. 1999); *Morris v. Columbia Constr. Co.*, 109 S.W.3d 314, 317 (Tenn. Ct. App. 2003)) ("Even if [the defendant's] testimony was uncontradicted and unimpeached, her interest in the outcome of the case alone is sufficient to create an issue of fact for the jury."); *Knapp v. Holiday Inns, Inc.*, 682 S.W.2d 936, 941–42 (Tenn. Ct. App. 1984) (summary judgment is not appropriate if the outcome of the case "hinges squarely upon the state of mind, intent, or credibility of the witnesses"). If the nonmoving party raises genuine doubt about a witness's credibility by showing bias, prejudice, or interest, then summary judgment is not appropriate and the trier of fact should decide the case. *Knapp*, 682 S.W.2d at 942 (citing *Sartor v. Ark.*

---

[16] Both the Architect Agreement and the Condominium Agreement contain integration clauses. The Condominium Agreement states: "This Agreement and the Exhibits and Addenda attached hereto is [sic] the entire agreement between the parties and may be amended only by an instrument in writing signed by the party against whom enforcement of any change is sought." The Architect Agreement was attached as Exhibit L to the Condominium Agreement.

*Natural Gas Corp.*, 321 U.S. 620, 628 (1944); 6 J. Moore, *Moore's Federal Practice* ¶ 56.15[4], at 56–524 (2d Ed. 1982)).

Here, the parties agree that the Architect Agreement was a prior valid agreement and the Condominium Agreement was a new valid agreement. The parties disagree about whether there is sufficient evidence of their intent, based on undisputed facts, to extinguish the Architect Agreement with the execution of the Condominium Agreement.

When the parties signed the Condominium Agreement, they did not express orally or in writing their intent to create a novation. The issue of the continued validity of the Architect Agreement only arose after TWB Architects realized that Braxton could not convey the penthouse condominium to Mr. Burrow. Thus, we look to the facts and circumstances surrounding the transaction and the conduct of the parties for inferences about their intent.

TWB Architects and Mr. Burrow's conduct and stated intention about the validity of the Condominium Agreement changed over time. After the parties signed the Condominium Agreement, Mr. Burrow and TWB Architects proceeded as if the Condominium Agreement controlled. TWB Architects stopped sending monthly invoices to Braxton. In November 2008, Mr. Burrow sent Mr. Rankin a letter demanding to close on the condominium and stating that if the closing did not take place, then he would treat the "[Condominium Agreement] as continuing in full force and effect, and require specific performance of [Braxton] to deliver a deed." He mentioned neither the Architect Agreement nor the design fee. When the closing did not take place by the deadline, Mr. Burrow wrote Mr. Rankin confirming the parties' intention that Braxton would convey to him Penthouse P6 and a boat slip rather than pay TWB Architects its design fee. Again, Mr. Burrow mentioned neither the Architect Agreement nor the design fee. Mr. Burrow later wrote Mr. Holland confirming that the condominium was Mr. Burrow's payment for TWB Architects' work.

Mr. Burrow acted as though he owned Penthouse P6. He invested nearly $40,000 in upgrades and repeatedly referred to Penthouse P6 as his penthouse. In December 2008, Mr. Burrow moved into the condominium and represented himself as its owner. Then for a short period of time, he leased the condominium and accepted payment of rent from a tenant. When Mr. Burrow moved back in, he continued to live in Penthouse P6 until late 2009, even after he sued Braxton to enforce his mechanic's lien.

But after Mr. Burrow realized that Braxton could not convey title to the condominium to him, Mr. Burrow changed course and began to rely on the Architect Agreement. In January 2009, Mr. Burrow proposed to Mr. Rankin in an email draft language for a letter to Mr. Holland stating that the condominium was his payment for the

design fee and that until closing occurred, he had insufficient security for being paid. Two weeks later, Mr. Burrow wrote Mr. Holland and mentioned for the first time that he planned to file a mechanic's lien unless Braxton deeded the condominium to him. In February 2009, as it continued to become more apparent that Braxton would not deed the condominium to him, Mr. Burrow told Mr. Holland that taking cash seemed to be the more attractive option, if not the only option. In his 2015 deposition, Mr. Burrow said that when he signed the Condominium Agreement, he was sure that the condominium would be sold to him for "zero dollars." Mr. Burrow added that had he known Braxton would pledge the condominium to the bank as part of the collateral for the construction loan, "that [would have] change[d] everything."

Mr. Burrow filed affidavits stating that he never intended for the Condominium Agreement to act as a novation and extinguish the Architect Agreement and TWB Architects' right to the design fee provided for in the Architect Agreement. TWB Architects contends that this evidence is dispositive because Braxton can never prove a clear and definite intention of all the parties to extinguish the Architect Agreement. That said, Mr. Burrow's self-serving testimony after the fact suggests, but is not conclusive evidence of, his intent when he entered into the Condominium Agreement. If it were, no party could ever successfully assert the affirmative defense of novation.

From the evidence, it could be inferred that Mr. Burrow successfully recruited Mr. Rankin to change his testimony in favor of Mr. Burrow's position that there was no novation. Mr. Rankin first stated under oath that TWB Architects had no right to its fee because the parties intended a novation with the Condominium Agreement. In 2009, he stated in an affidavit that all parties understood that the Condominium Agreement discharged all obligations owed and extinguished the rights of the parties under the Architect Agreement. In 2010, Mr. Rankin testified that the Architect Agreement was no longer the agreement between the parties and that the Condominium Agreement created a novation. During construction of the condominium project, based on the Condominium Agreement, Mr. Rankin routinely submitted forms to the bank stating under oath that there were no unpaid architect fees because of the Condominium Agreement.

But Mr. Rankin reversed course after receiving money from Mr. Burrow. When Mr. Rankin was in jail in October 2011, Mr. Burrow visited him, provided "emotional support," and contributed money to help Mr. Rankin get out of jail and hire a lawyer. Mr. Rankin wrote to Mr. Burrow that Mr. Burrow's visits to the jail were "unforgettable" and that Mr. Burrow was "on the forefront of my thoughts as I find a way to sow what I have reaped."

Mr. Burrow later paid $5,000 toward Mr. Rankin's legal expenses and loaned Mr. Rankin $48,000. Mr. Burrow then paid $36,500 in the form of a loan from an

"anonymous entity," which was Mr. Burrow, so that Mr. Rankin could pay restitution, have his record expunged, and avoid the risk of a conviction at trial and time in jail. Under the December 2013 loan, interest accrued at the rate of eighteen percent per year, and Mr. Rankin was to make monthly payments of $100 per month. Mr. Rankin admitted that he could not repay the $84,500 loan from the "anonymous entity." He also admitted that the debt would increase monthly because the $100 monthly payment did not pay all of the interest that accrued each month.

While *TWB I* was pending in the Court of Appeals, Mr. Rankin and Mr. Burrow began discussing additional affidavits for Mr. Rankin to sign. In an email exchange, Mr. Rankin said that he would like to read the appellate brief filed by Braxton before settling on the content of the affidavits. Mr. Rankin also stated he had read TWB Architects' brief and thought it was "very good and should do the trick." He later said that the outcome of the case would be "really close . . . . But I know you'll win because you have so many of us praying for the just outcome."

After the Court of Appeals remanded the case in *TWB I*, Mr. Rankin signed additional affidavits, at Mr. Burrow's request, contradicting his 2009 affidavit and 2010 deposition testimony. In 2015, Mr. Rankin testified by deposition that in his previous testimony, he had not understood what novation meant. Mr. Rankin also stated that the parties had intended for the Condominium Agreement to replace the Architect Agreement *only* if Braxton complied with the Condominium Agreement by conveying Penthouse P6 to Mr. Burrow. Now, according to Mr. Rankin, there was no novation and TWB Architects was entitled to its fee under the Architect Agreement.

Mr. Rankin's 2009 sworn statements supported Braxton's position that there had been a novation, and his 2015 sworn statements supported TWB Architects' position that there had not been a novation. Mr. Rankin had nothing to lose by changing his story (other than his credibility). By 2015, Mr. Rankin had no ownership interest in Braxton, had no stake in the outcome of this case, had filed for personal bankruptcy, and had received $84,500 from an "anonymous entity," thinly disguised as Mr. Burrow. On the other hand, TWB Architects had a lot to gain (an architect fee of over $888,000) by Mr. Burrow's and Mr. Rankin's statements that the parties did not intend a novation.

Summary judgment should not be granted when, as here, the record contains "clear evidence of a witness's lack of credibility." *Hepp v. Joe B's, Inc.*, No. 01A01-9604-CV-00183, 1997 WL 266839, at *3 (Tenn. Ct. App. May 21, 1997) (citing *Burgess v. Harley*, 934 S.W.2d 58, 68 (Tenn. Ct. App. 1996)). Mr. Rankin's contradictory testimony in 2010 and 2015 and his bias in favor of Mr. Burrow raise

concerns about his credibility.[17] Mr. Burrow's credibility is also at issue. His conduct has not consistently shown that he intended for the Architect Agreement to remain in effect and not be replaced by the Condominium Agreement.

Although Mr. Rankin's credibility is questionable, the "cancellation rule" does not, as TWB Architects asserts, completely nullify his testimony. When a witness makes contradictory statements about a single fact, those statements cancel each other out and are considered to be "no evidence" of that fact. *Church v. Perales*, 39 S.W.3d 149, 169–70 (Tenn. 2000) (citing *Johnston v. Cincinnati New Orleans & Tex. Pac. Ry.*, 240 S.W. 429, 436 (Tenn. 1922); *State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993); *Gambill v. Middle Tenn. Med. Ctr.*, 751 S.W.2d 145, 149–50 (Tenn. Ct. App. 1988)). The statements only cancel each other out, however, if the contradiction is unexplained and "neither statement can be corroborated by other competent evidence." *Church*, 39 S.W.3d at 170 (citing *Matthews*, 888 S.W.2d at 450; *Gambill*, 751 S.W.2d at 151); *see also* 1 Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.07[5] (6th Ed.) (Supp. 2017) ("No sensible decision holds that a witness's testimony on a fact is automatically discounted simply because the witness contradicted himself on that fact. Rather, the court assesses whether there is an explanation for the inconsistency and whether either version is corroborated by other evidence.").

"When the cancellation rule is invoked at the summary judgment stage to challenge evidence opposing the motion, the courts must view the challenged evidence in the light most favorable to the opponent of the motion." *Church*, 39 S.W.3d at 170. The course of dealings and the communications between Mr. Rankin and Mr. Burrow provide evidence of Mr. Rankin's intent about the Condominium Agreement that raises a disputed issue of material fact.

Here, the evidence about the issue of novation is unclear and inconsistent. "Where there is conflicting evidence, the parties' intent on a possible novation is a question of fact." *Lowe v. Smith*, No. M2015-02472-COA-R3-CV, 2016 WL 5210874, at *7 (Tenn. Ct. App. Sept. 19, 2016) (citing 21 Steven W. Feldman, *Contract Law and Practice* § 3:43). This case is rife with conflicting evidence about whether Mr. Burrow and Mr. Rankin intended to replace the Architect Agreement with the Condominium Agreement.

---

[17] After we accepted this case for review, Mr. Rankin drafted a one-page document that he titled "Amicus Curiae" and sent by email to counsel for Braxton. After consultation with the Tennessee Board of Professional Responsibility, counsel for Braxton submitted the document to the Court with a Notice of Filing before the parties had filed their briefs. In the "Amicus Curiae" document, Mr. Rankin appears to change his story yet again. This so-called amicus curiae brief was not filed with a motion seeking leave of the Court as required by Tennessee Rule of Appellate Procedure 31. We addressed this issue during oral arguments, and the parties agree with the Court that the "Amicus Curiae" document does not merit the Court's consideration.

Their conduct after signing the Condominium Agreement suggests they may have intended to be bound by it. But later, when compliance with the Condominium Agreement became doubtful, Mr. Burrow and, later, Mr. Rankin insisted the Architect Agreement was the controlling agreement. It all comes down to credibility of the parties and witnesses. This is precisely the type of case in which a fact-finder should have the opportunity to observe Mr. Rankin's and Mr. Burrow's demeanor during direct and cross-examination to determine the credibility of their testimony.

In sum, the parties' conduct creates disputed issues of material fact concerning their intentions about the validity of the Architect and Condominium Agreements. Here, the material facts in dispute do not support a conclusion that reasonable minds could not find that the parties intended for the Condominium Agreement to extinguish TWB Architects' right to a fee under the Architect Agreement. When viewed in the light most favorable to Braxton, as the summary judgment standard of review requires, the record is replete with issues of material fact from which a rational trier of fact could conclude that the Condominium Agreement created a novation. The self-serving testimony of Mr. Burrow, combined with the contradictory testimony of Mr. Rankin, does not satisfy TWB Architects' burden under *Rye*. *See Rye*, 477 S.W.3d at 264.

### *Conclusion*

We hold that TWB Architects has no right to summary judgment because there are disputed questions of material fact about whether the parties intended a novation when they executed the agreement for the purchase of the penthouse condominium by Mr. Burrow. We reverse the Court of Appeals and the Chancery Court for Cheatham County and remand to the trial court for further proceedings consistent with this Opinion. We tax the costs to TWB Architects, Inc., for which execution may issue, if necessary.

_____
SHARON G. LEE, JUSTICE

- 20 -

FILED
08/01/2019
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

**TWB ARCHITECTS, INC. v. THE BRAXTON, LLC ET AL.**

**Chancery Court for Cheatham County**
**No. 14181**

_____

**No. M2017-00423-SC-R11-CV**
_____

**ORDER**

After additional consideration, the opinion filed by this Court on July 22, 2019, is hereby vacated and withdrawn, and the opinion filed contemporaneously with this order is substituted for the previously filed opinion. This opinion contains additional explanation in the Summary Judgment Standard section about the burden of production for a moving party that bears the burden of proof at trial.

PER CURIAM